**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| HENRY ESPEJO, individually and on behalf of all others similarly situated, | |
|      Plaintiff, | Case No.: 1:11-cv-08987 |
| v. | Honorable Charles P. Kocoras |
| SANTANDER CONSUMER USA INC., an Illinois corporation, | |
|      Defendant. | |
| FAYE LEVINS, *et al.*, on behalf of themselves and all others similarly situated, | |
|      *Plaintiffs*, | Case No.: 12-cv-09431 |
| v. | Honorable Charles P. Kocoras |
| SANTANDER CONSUMER USA INC., | |
|      *Defendant*. | |

**DEFENDANT SANTANDER CONSUMER USA INC.'S
<u>OPPOSITION TO PLAINTIFF LEVINS' MOTION FOR CLASS CERTIFICATION</u>**

James A. Rolfes
(Bar No. 6200271)
*jrolfes@reedsmith.com*
Henry Pietrkowski
(Bar No. 6230048)
*hpietrkowski@reedsmith.com*
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207-1000

Abraham J. Colman
*pro hac vice*
*acolman@reedsmith.com*
REED SMITH LLP
355 South Grand Avenue
Los Angeles, CA 90071
(213) 457-8000

Marc A. Lackner
*pro hac vice*
*mlackner@mcguirewoods.com*
David Reidy
*pro hac vice*
*dreidy@mcguirewoods.com*
MCGUIRE WOODS LLP
505 Sansome Street, Suite 700
San Francisco, CA 94111
(415) 844-1974

*Attorneys for Defendant Santander Consumer USA, Inc.*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND........................................ 4

    A.    Of the Thirteen Original Named Plaintiffs, Only Faye Levins Seeks Certification of a TCPA Class Against Santander. ................................. 4

    B.    Santander Obtains Prior Express Consent Before Placing Calls To Individuals, Including By Verifying the Numbers Directly. ................................. 5

        1.    Santander Follows a Robust TCPA Compliance Program. ...................... 5

        2.    Santander Maintains Procedures To Obtain Consent from Consumers and To Document that Consent in Individual Account Notes. ..................................................................... 7

    C.    Santander's Records Show Levins Gave Consent To Receive Calls from Santander and Is Therefore Excluded from Her Own Class Definition; Espejo Is Excluded for the Same Reason. ............................................................. 9

    D.    The Parties Engaged in Extensive Fact and Expert Discovery Including the Production of 400 Santander Account Files for Plaintiffs' Review .................... 11

III.    ARGUMENT .................................................................................................. 13

    A.    Levins Attempts To Certify An Improper Fail-Safe Class. ................................. 15

    B.    Levins Cannot Serve as a Class Representative Because She Is Not a Member of the Class She Seeks To Certify. ................................................. 16

    C.    Levins Cannot Establish Commonality as Required by Rule 23(a)(2)................ 18

    D.    Levins' Proposed Class Is Patently Unmanageable and Inferior To Individual Actions, and Levins Fails To Establish that Common Issues Would Predominate in a Class Trial. ................................................. 20

        1.    Levins Cannot Establish that a Class Action Would Be Superior To Individual TCPA Cases............................................................. 22

        2.    Individual Issues Would Predominate over Common Questions in a Class-Wide Trial of this Action ............................................. 28

IV.    CONCLUSION................................................................................................ 31

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997)................................................................................................18, 21

*Balthazor v. Central Credit Services, Inc.,*
2012 U.S. Dist. LEXIS 182275 (S.D. Fla. Dec. 27, 2012)....................................19

*Blades v. Monsanto Co.,*
400 F.3d 562 (8th Cir. 2005) .................................................................................19

*Califano v. Yamasaki,*
442 U.S. 682 (1979)................................................................................................13

*Chicago Teachers Union, Local No. 1 v. Board of Educ. of City of Chicago,*
797 F.3d 426 (7th Cir. 2015) .................................................................................14

*Comcast Corp. v. Behrend,*
133 S.Ct. 1426 (2013).....................................................................................4, 13, 14

*Connelly v. Hilton Grand Vacations Co.,*
LLC, 294 F.R.D. 574 (2013)...........................................................................14, 15, 29

*Conrad v. Gen. Motors Acceptance Corp.,*
283 F.R.D. 326 (N.D. Tex. 2012) ..........................................................................29

*Dafforn v. Rousseau Assocs., Inc.,*
No. F 75-74, 1976 WL 1358 (N.D. Ind. July 27, 1976) ........................................15

*Driver v. Appleillinois, LLC,*
No. 06–cv–6149, 2013 WL 5818899 (N.D.Ill. Oct. 29, 2013)...............................15

*Forman v. Data Transfer, Inc.,*
164 F.R.D. 400 (E.D. Pa. 1995).............................................................................26

*Gannon v. Network Tele. Servs., Inc.,*
No. 12–9777, 2013 WL 2450199 (C.D. Cal. June 5, 2013) ..............................22, 29

*Gen Tel. Co. Sw. v. Falcon,*
457 U.S. 147 (1982)................................................................................................14

*Gene and Gene LLC v. BioPay LLC,*
541 F.3d 318 (5th Cir. 2008) .................................................................................29

*Genenbacher v. CenturyTel Fiber Co. II*,
   244 F.R.D. 485 (C.D. Ill. 2007) ........................................16

*Gomez v. St. Vincent Health, Inc.*,
   649 F.3d 583 (7th Cir.2011) ........................................18

*Hayes v. Wal-Mart Stores, Inc.*,
   725 F.3d 349 (3d Cir. 2013)........................................28

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. Pa. 2008)........................................21, 25, 28

*Indiana State Emp. Ass'n, Inc. v. Indiana State Highway Comm'n*,
   78 F.R.D. 724 (S.D. Ind. 1978)........................................15

*Jamie S. v. Milwaukee Pub. Sch.*,
   668 F.3d 481 (7th Cir. 2012) ........................................14

*Jamison v. First Credit Servs.*,
   290 F.R.D. 92 (N.D. Ill. Mar. 28, 2013) ........................................2, 28, 29, 30, 31

*John Roe I v. Bridgestone Corp.*,
   492 F. Supp. 2d 988 (S.D. Ind. 2007) ........................................15

*Johnson v. Yahoo!, Inc.*,
   No. 14 CV 2028, 2016 WL 25711 (N.D. Ill. Jan. 4, 2016)........................................18

*Kaye v. Amicus Mediation & Arbitration Grp., Inc.*,
   300 F.R.D. 67 (D. Conn. 2014)........................................18

*Kurczi v. Eli Lilly & Co.*,
   160 F.R.D. 667 (N.D. Ohio 1995) ........................................27

*London v. Wal-Mart Stores, Inc.*,
   340 F.3d 1246 (11th Cir. 2003) ........................................27

*Lucas v. Vee Pak, Inc.*,
   68 F. Supp. 3d 870 (N.D. Ill. 2014) ........................................15

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012)........................................28

*Messner v. Northshore Univ. Healthsystem*,
   669 F.3d 802 (7th Cir. 2012) ........................................15, 19

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ........................................ *passim*

*Oshana v. Coca-Cola Co.*,
  472 F.3d 506 (7th Cir. 2006) ....................................................................17

*Panwar v. Access Therapies, Inc.*,
  No. 12-00619, 2015 WL 329013 (S.D. Ind. Jan. 22, 2015).....................15

*In re Potash Antitrust Litig.*,
  667 F. Supp. 2d 907 (N.D. Ill. 2009) ..................................................16, 17

*Randleman v. Fid. Nat. Title Ins. Co.*,
  646 F.3d 347 (6th Cir. 2011) ....................................................................15

*In the Matter of Rhone-Poulenc Rorer, Inc.*,
  51 F.3d 1293 (7th Cir. 1995) ....................................................................27

*Simer v. Rios*,
  661 F.2d 655 (7th Cir. 1981) ..............................................................15, 21

*Spano v. The Boeing Co.*,
  633 F.3d 574 (7th Cir. 2011) ....................................................................15

*Spokeo, Inc. v. Robins*,
  578 U.S. __, 136 S.Ct. 1540 (2016)..........................................................20

*Szabo v. Bridgeport Mach., Inc.*,
  249 F.3d 672 (7th Cir. 2001) ....................................................................14

*Versteeg v. Bennett, Deloney & Noyes, P.C.*,
  271 F.R.D. 668 (D. Wyo. 2011) ................................................................29

*Vigus v. S. Illinois Riverboat/Casino Cruises, Inc.*,
  274 F.R.D. 229 (S.D. Ill. 2011) ................................................................26

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011).........................................................13, 14, 18, 19, 20

*Warnick v. Dish Network LLC*,
  301 F.R.D. 551 (D. Colo. 2014) ................................................................22

**Statutes**

47 U.S.C. § 227......................................................................................1, 14, 16, 30

**Other Authorities**

137 Cong. Rec. 30,821-30822 (1991)........................................................26

*2003 TCPA Order*,
  18 FCC Rcd at 14092................................................................................20

Fed. R. Civ. P. 23 ............................................................................................................ *passim*

McLaughlin on Class Actions § 4:39 (12th ed. 2015) ...................................................27

*TCPA Omnibus Declaratory Ruling and Order*, FCC 15-72 at ¶ 17 .............................20

## I.    INTRODUCTION

Defendant Santander Consumer USA Inc. ("Santander"), a specialized consumer finance company focused in large part on vehicle finance, has millions of customers and uses the telephone to communicate with them. It does so pursuant to a robust program to ensure compliance with the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA"). (*See infra*, Sec. II.B.)  Plaintiff Levins's Motion for Class Certification (Dkt. 100) ("Motion") seeks to certify a class as to some undescribed and unquantified fragment of these millions of calls, which Levins speculates may exist despite Santander's TCPA compliance efforts.

Levins' Motion fails for a number of reasons. Foremost, it fails to identify a single individual who fits within the proposed class or subclass, and fails to offer any methodology for identifying such class members short of a file-by-file review of 5.5 million customer accounts. Although we do not know who is *in* the class, we do know that Henry Espejo ("Espejo") and Levins herself—the only two remaining plaintiffs—*are excluded*.

Levins makes no mention of Espejo in her motion, apparently conceding after four years of litigation that any TCPA claims he might have cannot fit within any class she can advance. As for Levins, she at least asserts that some small portion of the "hundreds" of TCPA violations she claims actually fall within the class she seeks to certify. But, in doing so, Levins ignores her own class definition, which excludes calls for which consent is "reflected in Santander's records." (Motion ¶ 4.) Because those records show that Levins consented to these calls, her claims related to the few calls she asserts are still in the putative class also fall outside her own class definition. As such, she is not an adequate representative. (*See infra*, Sec.s II.C & III.B.)  For this reason alone, her Motion must be denied.

Moreover, courts have consistently rejected certification of TCPA classes where consent is likely to be a significant issue, particularly where the defendant "sets forth specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cellphone." *Jamison v. First Credit Servs.*, 290 F.R.D. 92, 106-07 (N.D. Ill. Mar. 28, 2013). Santander makes precisely such a showing here. (*See infra*, Section II.B.) Santander's robust TCPA compliance program to obtain *and document consent* is demonstrated by Levins' own account notes, which show she provided consent. Because consent is documented at the account level, however—in credit applications, call recordings, individualized account notes and other miscellaneous documents—any attempt to identify a class of individuals who did not give consent necessarily implicates an individualized exercise, rendering class treatment inappropriate. *Jamison*, 290 F.R.D. at 106-07.

Levins ignores these insurmountable difficulties and contends that to certify a class all a court may require is that the class be "clearly" defined, its membership be identifiable by "objective criteria," and that the data necessary to do so reside with the defendant; nothing more. (Mem. in Support of Pl. Levins's Mot. for Class Cert. (Dkt. 103) ("Pl.'s Mem.") at 14-16.) That is not the law in this Circuit or any other. As the Seventh Circuit has made clear, a court must consider "the likely difficulties in managing a class action" when determining whether the proposed class "is superior to other available methods for fairly and efficiently adjudicating the controversy." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 658 (7th Cir. 2015).

Here, Levins has not met her burden to show that the proposed class is either manageable or superior, nor can she. Whether the putative class is defined as all customers who received calls, some without consent, or, as Levins proposes, *only* those customers who did not consent, the practical result is the same—literally millions of account records will have to be reviewed

2

and individual determinations regarding consent will have to be made as to each call made to each number called. Identifying which of the calls were made to cell phones, and then identifying the subscribers to those phones (as required by Levins' class definition), only adds further complexity to an already impossible task.

This is not a question of whether Levins can or should be required to identify putative class members with precision pre-certification but whether she could *ever* identify them and, if so, at what cost. After four years of litigation and discovery, Levins offers no methodology for the review of the millions of customer records implicated, what this monumental task might require, or, more importantly, any credible indication of how many class members this unprecedented task might yield.  Not surprisingly, Levins' Motion fails even to mention her expert, Serge Jorgensen, who was specifically designated to fashion a methodology for identifying class members but failed to do so.  (*See infra*, Sec. II.D.)  By contrast, Santander demonstrates here that this effort would cost millions of dollars, take years, and likely only prove that the overwhelming majority, if not all, of its customers gave consent to be called—consistent with Santander's compliance program. (*See infra*, Sec. II.B.)

This is not a situation where putative class members would be deprived of a viable recourse absent certification because the value of claims is so low that "only a lunatic or fanatic" would litigate individually. *See, Mullins*, 795 F.3d at 665. TCPA violations are subject to penalties of from $500 to $1,500 *per call*, turning single-plaintiff TCPA litigation into a cottage industry. Indeed, Levins' own lawyers in this case have filed dozens of such individual TCPA cases, including against Santander.  (*See infra*, Sec. III.D.2.)  Indeed, Espejo and Levins appear to be pursuing individual TCPA claims that fall outside the class definition.

Rule 23's requirements are not easily satisfied. It is Levins' burden to show that a class action is proper here. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Because Levins fails to meet that burden, her Motion should be denied.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Of the Thirteen Original Named Plaintiffs, Only Faye Levins Seeks Certification of a TCPA Class Against Santander.

Santander is a specialized consumer finance company focused in large part on vehicle finance. (06/10/16 Declaration of Wayne Nightengale (attached as Ex. 4) at ¶ 2.) To service these loans, Santander must communicate with its customers by telephone. (*Id.*)

In this and the other related matters pending before this Court, thirteen individual plaintiffs alleged that certain of Santander's telephone communications did not comply with the TCPA. (06/09/16 Decl. of Henry Pietrkowski (attached as Ex. 12) at ¶ 2.) Four years later, only Levins and Espejo remain, the others having been dismissed; and only Levins moves for class certification. (*Id.*)

On November 11, 2015, at Santander's insistence and this Court's direction, Levins and Espejo finally disclosed what was to be their "final" class definitions, consisting of four subclasses, which purported to include the claims of both Espejo and Levins. (*Id.* at ¶ 2 and Ex. A.) However, by this Motion, Levins seeks to certify a different Class and Subclass, dropping two of her "final" proposed subclasses and altering the remaining two, as follows:

> **TCPA Class**: All individuals called by Santander or on its behalf, using the Aspect dialer system between December 19, 2007 and the present, on a cellular telephone number to which the individual was the subscriber, and which was not (a) listed in any application for credit or financing submitted to Santander or any of its originating creditors, (b) otherwise volunteered by the individual directly to Santander orally or in writing prior to the time of Santander's first call to that number, as reflected in Santander's records, or (c) verified prior to being called for the first time by Santander, as reflected in Santander's records.

> **Number Trapping Subclass**: All members of the TCPA Class called by Santander or on its behalf, on a cellular telephone number that Santander captured

through calls made to its IVR system (as indicated by its identification in Santander's records with the notation 'IVR' followed by an Arabic numeral (e.g., IVR1, IVR2, etc.)).

(Dkt. 100, at ¶ 4; Ex. 12 at ¶ 6.)

Levins excludes from the classes any "individuals who executed a financing application or agreement containing an arbitration clause with Santander or any of its originating creditors," "individuals who provided Santander with releases or waivers of their TCPA claims," and "individuals who have filed any lawsuit or arbitration against Santander asserting a TCPA claim." (Dkt. 100 at 2 n.1; Ex. 12 at ¶ 6.)

## B. Santander Obtains Prior Express Consent Before Placing Calls To Individuals, Including By Verifying the Numbers Directly.

### 1. Santander Follows a Robust TCPA Compliance Program.

Santander employs the Aspect Telephone System to receive inbound calls and make outbound calls. (10/22/14 Dep. of Wayne Nightengale (attached as Ex. 10) at 42:8-18.) This system offers various dialing modes or features for making outbound calls. (Ex. 4 at ¶ 6.) For some of the calls Santander attempted during the putative class period, Santander used the dialer feature of the Aspect Telephone System. (*Id.*) In particular, the dialer would initiate calls to telephone numbers from a daily-provided list of criteria-selected telephone numbers when associates pressed computer screen buttons to indicate their availability to receive new calls. (*Id.*) Santander also manually dials telephone numbers using the Aspect Telephone System, with Santander associates either typing in the 10 digit telephone numbers, or bringing the customer or other account-related numbers up on their computer screens and clicking those numbers. (*Id.* at ¶ 7.) Pursuant to her class definition, however, Levins only takes issue with the calls Santander made using the "Aspect dialer" feature of Santander's system. (Pl.'s Mem. at 11; *see also* Dkt. 100 at ¶ 4 ("using the Aspect *dialer* system".)

Santander has made significant investments in system staffing and technology to ensure that its servicing activities comply with federal and state consumer debt collection and communication rules. (Ex. 4 at ¶ 8; *see also* 08/17/15 Dep. of Michelle Rodgers (attached as Ex. 11) at 24:16-24, 34:8-11, 35:6-15, 50:15 to 51:1; 57:2-14 (Santander has a TCPA policy); 28:24 to 29:14 (Santander performs review and update of policies on at least an annual basis); 32:5-16 (Santander receives updates to TCPA regulation from counsel and regulatory publications).) All employees, for instance, receive annual training on how to comply with the TCPA and other relevant consumer protection laws. (Ex. 11 at 20:21-25, 37:8-10; 07/21/15; Dep. of Joseph Burda (attached as Ex. 5) at 27:9 to 28:12, 35:7-18; Ex. 10 at 129:13 to 130:6.)

Santander also maintains written TCPA policies that it updates periodically, as regulations change, the company adopts new documentation requirements, or counsel provides additional guidance. (Ex. 10 at 128:3-15; Ex. 11 at 58:12-25, 60:8-23, 68:3-5; *see also*, Ex. 12 at Ex. D: SCUSA TCPA Policy Publication Dates: April 2012 (SCUSA/E 11035-38), 12/27/12 (SCUSA/E11039-42), Jan. 2014 (SCUSA/E 11030-34), Sept. 2014 (SCUSA/E 00803-7) and 02/1/0/15 (SCUSA/E 55365-74).) Those written policies emphasize Santander's policy of using the dialer to call a person only when he or she first has given permission to be contacted at that number. (Ex. 12 at Ex. D: SCUSA/E 0805-806, 11032-33, 11037, 11042, 55369-70.) Quality assurance teams also perform account reviews and grade phone calls between Santander's agents and its customers to ensure adherence to policies and procedures as well as compliance with regulatory rules. (Ex. 10 at 33:4-22; Ex. 11 at 83:12 to 84:16; 07/17/15 Dep. of Mark Nerios (attached as Ex. 9) at 141:6-23.) Failure to follow TCPA policies can result in disciplinary action, including termination for intentional violations. (Ex. 10 at 132:25 to 134:4.) Thus,

Santander has in place a compliance scheme that assures it receives its customers express consent prior to using its dialer to contact their cell phone numbers. (Ex. 4 at ¶ 8.)

**2.      Santander Maintains Procedures To Obtain Consent from Consumers and To Document that Consent in Individual Account Notes.**

Credit applications and other loan files serve as a primary source from which Santander obtains its customers' express consent to receive calls, and these files are stored individually in scanned pdf format. (10/29/14 Decl. of Wayne Nightengale (attached as Ex. 1) at ¶ 10; Ex. 9 at 26:17 to 27:3.) Santander also obtains consent during calls with customers. (Ex. 9 at 51:7 to 52:8.) Santander associates are trained to confirm in each in-bound call whether the number on which the caller contacted Santander is a good number to contact the caller regarding the customer account identified. (04/21/16 Decl. of Wayne Nightengale (attached as Ex. 3) at ¶ 5; Ex. 9 at 37:22 to 41:2, 49:15 to 52:8.) Santander also periodically verifies contact information with its customers, confirming the telephone numbers on which the customers want Santander to contact them. (Ex. 9 at 46:1-16, 60:15-23; 12/02/15 Decl. of Wayne Nightengale (attached as Ex. 2) at ¶ 9.)[1] Santander further employs software that prompts agents to verify contact information, again confirming the telephone numbers are good numbers on which to contact the person associated with the telephone number. (Ex. 3 at ¶ 5.)

Santander maintains customer information on the "My Supervisor" or "My Sup" host system—a graphic interface that sits on top of a commercially available customer account management system. (Ex. 10 at 52:25 to 53:9.) Company employees enter some, but not necessarily all, telephone numbers contained in credit applications and loan files into this host system when setting up customer accounts. (Ex. 9 at 29:14-21; Ex. 12 at 90:23 to 91:7) Associates further record the oral consent they receive when talking with callers in the activity

---

[1] "Verification" can mean confirming that a number is a good contact for a customer, or simply reaffirming a contact number that Santander already has consent to call.

notes maintained in My Sup, (Ex. 1 at ¶ 18; Ex. 10 at 74:8-22), and the computer systems update the activity notes when the company receives consent in written form such as in emails or chat transcripts. (Ex. 4 at ¶ 15.) Like the other forms of oral and written consent Santander receives, the company's associates also record verifications in the activity notes. (Ex. 2 at ¶ 10.) Lastly, in recent years, Santander also audio records orally provided consent, a process documented in its 2015 revision to its TCPA policies. (Ex. 11 at 71:8 to 72:12; Ex. 12 at Ex. D: SCUSA/E 55370.)[2]

Santander also obtains consent to call telephone numbers that it sources through what Levins refers to as "number trapping." (*See* Pl.s Mem. at 6.) Santander's telephone system identifies the telephone numbers its customers or other persons related to customer accounts use to call Santander. (Ex. 3 at ¶ 5.) When Santander receives an in-bound call, it's "Interactive Voice Response System," or "IVR," prompts the caller to enter or provide an account number, social security number and other identifying information. (Ex. 10 at 94:25 to 95:12.) If not previously entered into My Sup, Santander's IVR system will identify the number as "IVR1." (Ex. 9 at 41:6-24, 117:12-16; Ex. 4 at ¶¶ 29-30.)

When the IVR system then transfers the call to an associate, that associate, in accordance with Santander's training, asks the caller to identify the type of phone (*e.g.*, "home," "cell"), and confirm that the identified number is a good number on which to contact the caller. (Ex. 9 at 37:22 to 40:10; 49:15 to 50:4.) If so, the associate updates Santander's activity notes to show the phone as, for example, "IVR-HOME," thus signifying both the type of phone, and the express consent, associated with that phone number. (*Id.*; Ex. 4 at ¶ 29.) (As discussed below, this is

---

[2] Plaintiff falsely contends that Santander by policy only accepted *written* consent to make cell phone calls until 2014, (Pl.'s Mem. at 17), misconstruing Santander's policy of requiring written consent prior to making *marketing* calls as opposed to the collections calls at issue here. (*See* Ex. 4 at ¶ 15.) In fact, Santander accepted verbal consent to call cell phone numbers regarding collections matters, as demonstrated by its verbal verification process, which Plaintiff includes as part of her proposed class definition. (*See* Pl.'s Mem. at 11.)

what occurred in Levins' case.) Significantly, until that such identification and express consent is received, Santander does not use its dialer to contact the IVR-sourced phone. (Ex. 4 at ¶ 30.) Additionally, if the person associated with the telephone number indicates he or she does not want Santander to use the IVR number in the future, the associate enters a "do-not-call" code and the Santander software prevents further outbound calls to that number. (Ex. 4 at ¶ 29; Ex. 3 at ¶ 6.)[3]

Thus, if necessary, Santander can prove express consent to call a particular cell telephone number by reference to the activity notes, scanned copies of financing documents including loan applications, audio records and other miscellaneous documents associated with the account on a file-by-file basis. (Ex. 1 at ¶ 18.) As discussed further below, Santander cannot conduct this review automatically across a large portfolio of accounts. (Ex. 4 at ¶ 23.)

### C. Santander's Records Show Levins Gave Consent To Receive Calls from Santander and Is Therefore Excluded from Her Own Class Definition; Espejo Is Excluded for the Same Reason.

When Levins missed payments on her 2009 car loan (07/14/15 Deposition of Faye Levins (attached as Ex. 8) at 52:11-53:12; Ex. 12 at Ex. E: SCUSA/B 43-46, 50; Ex. 3 at ¶ 24.) Santander contacted Levins at three cell phone numbers ending in 6954, 9678 and 6074. (Pl. Faye Levins' First Supp. Ans. To Def.'s First Set of Interrogatories, Resp. to Interrog. 3 (attached as Ex. 13); Ex. 3 at ¶ 23.)

Santander's records show that it obtained the 6954 number from Levins' January 31, 2009 credit application, where she identified the 6954 number as both her "home" and "cell"

---

[3] The same can be said of the so-called "skip traced" numbers. Santander employs third party external databases, such as Lexis-Nexis' Accurint, to find telephone numbers associated with its customers and records the skip work in the activity notes for the relevant accounts. (Ex. 10 at 91:8 to 92:7; 125:15 to 126:5; Ex. 9 at 80:20 to 81:7.) Until Santander receives and records the telephone number user's express consent to Santander's use of that number as a good contact number, however, Santander will not use its dialer to call that telephone number. (Ex. 4 at ¶ 8.)

phone numbers. (Ex. 8 at 30:5-13, 31:1-6; Ex. 12 at Ex. E: SCUSA/B 00053-54; Ex. 9 at 26:17

to 27:9.) The credit application contained Levins' written prior express consent to receive calls

and text messages to numbers listed on the application. (Ex. 8 at 34:17 to 35:80; Ex. 12 at Ex. E:

SCUSA/B 00053-54.)

Levins provided Santander with oral express consent to call her second phone number

ending in 9678 in a May 14, 2012 tape-recorded call on which she identified her 9678 number as

a current cell phone number that Santander could use to contact her. (Ex. 8 at 113:8-12, 114:8-

15; audio recording of the May 14, 2012 phone call (Ex. 12 at Ex. F: SCUSA/B00076).)

With regard to the 6074 telephone number, Santander's activity notes for Levins' account

for that March 27, 2009 call reflect the following information:

> IB CUSTOMER PTP DPD:10 INCOMING CALL FROM (xxx) xxx-6074
> (IVR1'S HOME). SPOKE WITH FAYE LEVINS. PROMISE ONE: 358.73 ON
> 3/27/2009 BY SPEED PAY CON# 8939237 REVIEW DATE:3/28/2009

(Ex. 4 ¶ 34; Ex. 12 at Ex. D: SCUSA/E 48564.)

Translated into plain English, this note records Santander's receipt of an inbound ("IB")

call from the 6074 telephone number and a live conversation between Santander's associate and

Levins about her 10 days past due ("DPD:10") account. (Ex. 4 at ¶ 34) Levins promised to pay

("PTP") a payment of $358.73, which she immediately made over the phone using "SPEED

PAY." (*Id.*) Importantly, Santander's March 27, 2009 activity notes designate the 6074 telephone

number as "IVR1'S HOME." (*Id.* at ¶ 35.) As set forth above (*see* Section II.B.2), the

designation of Levins' IVR number as a "home" or "cell" number indicates that the agent who

spoke to Levins not only identified the 6074 number as her "home" telephone number, but also,

pursuant to Santander's procedures, confirmed 6074 as a good number on which to contact her.

(*Id.*) The "IVR1'S HOME" entry in the activity notes therefore confirms that Levins gave

Santander express consent to contact her at the 6074 number the very first time that she spoke with an agent using that number on March 27, 2009. (*Id.* at ¶ 36.)

Similarly, Henry Espejo also gave consent to be called in relation to his wife's Santander account. As reflected in the activity notes for Mrs. Espejo's account, on November 4, 2009, both Mr. and Mrs. Espejo together called Santander using a number ending -1411. (Ex. 12 at Ex. D: SCUSA/E 0799-800; Ex. 3 at ¶ 15.) During that call, Mrs. Espejo agreed that Santander could talk to Mr. Espejo about her debt (*i.e.*, as recorded in Maria Espejo's activity notes, "PERMANENT NOTE (0109) OKTT HENRY ESPEJO"). (Ex. 12  at Ex. D: SCUSA/E 00799-800; Ex. 3 at ¶ 15.) (Note: "OKTT" = 'OK to talk to.') Santander also obtained Mr. Espejo's confirmation that the 1411 telephone number was the appropriate telephone number at which to reach him, as Mr. Espejo confirmed in deposition testimony. (Ex. 9 at 51:7 to 52:8; 12/02/14 Dep. of Henry Espejo (attached as Ex. 6) at 74:5-12; Ex. 12 at Ex. D: SCUSA/E 00800.)

### D. The Parties Engaged in Extensive Fact and Expert Discovery Including the Production of 400 Santander Account Files for Plaintiffs' Review.

During the course of discovery, Plaintiffs sought and obtained Santander's production of a 400-account sample of activity notes and associated financing documents (Ex. 2, ¶¶ 3-4). Levins also designated Serge Jorgensen, her sole expert, to "determine if it would be feasible to use data [in Santander's records to] develop a process to automatically review that data to . . . identify members of a potential class." (11/18/15 Deposition of Serge Jorgensen (attached as Ex. 7) at 18:2-19:2.) Levins makes no mention in her Motion of the 400 sample accounts or Jorgensen.

Jorgensen confirmed that the only material he reviewed for his expert opinions were the *Plaintiffs'* Complaints and the 400 sample account files. (*Id.* at 48:3-49:23.) In an attempt to develop a methodology for identifying class members, Jorgensen performed cursory searches of

400 sets of sample activity notes, but could not establish a valid methodology for meeting

Levins' then-proposed class definitions. Jorgensen's searches of the activity notes focused on

whether Santander's records showed that a cell phone number had been "verified." (*Id.* at

141:11-18.) Jorgensen chose the word "verified" because it "jumped out" at him; he could not

say whether Santander used any other terms besides "verified" to denote authorization or

consent. (*Id.* at 142:9-143:2.) Even where Jorgensen claimed to isolate five accounts where cell

phones were called without being "verified," he did nothing to validate those results by manually

reviewing the activity notes but rather testified that his "intent" was "not to provide an analysis

of [the] calls" but simply to run the queries. (*Id.* at 156:11-158:6.) Jorgensen admitted that he did

not understand the codes Santander used in its records and therefore simply ignored them. (*Id.* at

94:18-95:13, 121:10-122:9, 122:22-124:9.)

Further, Jorgensen conceded that to identify any potential class members, he would need

input from "Santander technical teams to develop a set of queries and a set of analysis around all

of the data here." (*Id.* at 173:3-11.) Ultimately, Jorgensen's opinion amounted to a statement that

he could search records for instances of the word "verified" in proximity to the word "cell." (*See*

*id*. at 156-158).

Santander designated a rebuttal expert, Sonya Kwon of Navigant Consulting, who

identified numerous errors and inconsistencies in Jorgensen's analysis and approach. (*See* Ex. 12

at Ex. B, Expert Report of Sonya Kwon ("Kwon Rep.").) In particular, Kwon demonstrated that

Jorgensen's search results could not be replicated, and that Jorgensen did not understand the data

he analyzed, relied on unfounded assumptions, made methodology errors, and failed to consider

all of the data available to him. (*Id.* at ¶¶ 8, 11-14, 17-24, 26-34, 36.) In short, Kwon's testimony

undermined any assertion that Jorgensen could present, or had presented, a viable methodology

for identifying class members. On cross examination, even Jorgensen readily admitted he had not developed a process that specifically identified persons in any of the four proposed class definitions Plaintiffs' counsel disclosed on November 11, 2015. (Ex. 7 at 213:11 to 214:1.)

On December 8, 2015, Santander also disclosed an expert witness, Dr. Debra Aron, who opined that "identifying accurately all telephone numbers that satisfy the criteria of the TCPA Class or its Subclasses as defined by Plaintiffs requires, at a minimum, knowing the identity of the named telephone account subscriber . . . on the date of the call to that number." (*See* Ex. 12 at Ex. C ("Aron Report") at 5.) Dr. Aron stated that she had seen "no evidence that the identity of the subscriber or primary user of a called telephone number at the time of a specific call to that number in the past, can be obtained by a current review of Santander's historical records," and indeed that "identifying the intended called party would require an account-by-account review." (*Id*.) Dr. Aron ultimately concluded that, "Plaintiffs have not offered any methodology for identifying the telephone numbers belonging to the classes they have defined nor any uniformly reliable means of identifying the individuals associated with those telephone numbers at the time the calls were placed." (*Id*. at 6.) Although Levins sought and was given an opportunity to designate a rebuttal witness to respond to these conclusions (Dkt. 84, 87), Levins left Dr. Aron's report unrebutted.

## III.  ARGUMENT

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-701 (1979)). It is the plaintiff's burden to show that a class action is a proper vehicle for this lawsuit. *See Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013). To certify a class action, the plaintiff "must affirmatively

demonstrate his compliance with" *all* of the requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Dukes*, 564 U.S. at 345; *Gen Tel. Co. Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *Chicago Teachers Union, Local No. 1 v. Board of Educ. of City of Chicago*, 797 F.3d 426, 433 (7th Cir. 2015). Plaintiff must further establish that (1) the questions of law or fact common to the class members predominates over questions affecting only individual members, and (2) that a class action is the superior method of adjudication. Fed.R.Civ.P. 23(b)(3).

These requirements are not easily satisfied. A putative class representative must "affirmatively demonstrate" compliance with Rule 23 through "evidentiary proof"—mere allegations are insufficient. *Comcast*, 133 S.Ct. at 1432; *see also Falcon*, 457 U.S. at 160 ("actual, not presumed, conformance with Rule 23(a) remains … indispensable."); *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001). And the court must apply a strict burden of proof and conduct a "rigorous analysis" to conserve judicial resources, protect defendants, and safeguard the interests of absent class members whose claims the named plaintiffs seek to litigate. *Falcon*, 457 U.S. at 161; *see also, Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012).

Levins asserts claims against Santander for violation of the TCPA. 47 U.S.C. § 227. The TCPA, in relevant part, makes it unlawful for any person "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system" ("ATDS") or an "artificial or prerecorded voice" to "any telephone number assigned to a…cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii); *see also Connelly v. Hilton Grand Vacations Co., LLC*, 294 F.R.D. 574, 577 (S.D. Cal. 2013). For purposes of certifying a TCPA class, then, Levins must demonstrate that "individual

adjudication of the pivotal element of prior express consent is unnecessary." *See Connelly,* 294 F.R.D. at 577.

### A. Levins Attempts To Certify An Improper Fail-Safe Class.

Rule 23 implicitly requires that a plaintiff clearly define her proposed class using objective criteria. *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). A district court must understand at the class certification stage "the burdens that [identification of the class] might entail" so that "the court can decide whether the class device simply would be an inefficient way of trying the lawsuit…." *Simer v. Rios*, 661 F.2d 655, 670 (7th Cir. 1981). Further, the court must ensure "that those who will be bound by the judgment are clearly identifiable." *Driver v. Appleillinois, LLC,* No. 06–cv–6149, 2013 WL 5818899, at *8 (N.D. Ill. Oct. 29, 2013); *see also Spano v. The Boeing Co.*, 633 F.3d 574, 584 (7th Cir. 2011).

"Fail-safe" classes fail the ascertainability test because they improperly base class membership on the defendant's liability, which results in either a class member "win[ning], or by virtue of losing, [being] defined out of the class and … therefore not bound by the judgment." *Mullins*, 795 F.3d at 660 (citing *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 825 (7th Cir. 2012)).[4]

Levins proposes an improper fail-safe class here because she excludes those persons whose claims will fail on the grounds they provided express consent (through credit applications or other oral or written communications). (Motion at ¶ 4.) Levins has thus defined the class in

---

[4] Fail-safe classes exist where the class definition refers to the defendant's purported "illegal" or "impermissible" conduct (*see Dafforn v. Rousseau Assocs., Inc.*, No. F 75-74, 1976 WL 1358, at *1 (N.D. Ind. July 27, 1976); *Panwar v. Access Therapies, Inc.*, No. 12-00619, 2015 WL 329013, at *3 n.3 (S.D. Ind. Jan. 22, 2015)), concerns the plaintiff's "entitle[ment] to relief" (*Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)), "is in essence framed as a legal conclusion" (*see Indiana State Emp. Ass'n, Inc. v. Indiana State Highway Comm'n*, 78 F.R.D. 724, 725 (S.D. Ind. 1978)), "incorporate[s] elements of the merits of the[] claims" (*John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 992 n.1 (S.D. Ind. 2007)), or "beg[s] the question of liability" (*Lucas v. Vee Pak, Inc.*, 68 F. Supp. 3d 870, 880 (N.D. Ill. 2014)).

terms of the merits—*i.e.*, lack of "prior express consent." 47 U.S.C. § 227(b)(1)(A)(iii). Under her class definition, a cell phone subscriber called by Santander might obtain the benefit of an adjudication that Santander did not place a call using an ATDS; however, if the same individual provided consent or their TCPA claim otherwise falls outside Levins' ornate class definition, that putative class member suddenly drops from the class with no *res judicata* benefit to Santander. In other words, a member of Levins' class would either "win, or by virtue of losing, be defined out of the class." *See Mullins*, 795 F.3d at 660. Levins' proposed class definition therefore is improper as a matter of law.

Levins' class definition mirrors the definition rejected on fail-safe grounds in *Genenbacher v. CenturyTel Fiber Co. II*, 244 F.R.D. 485, 487-88 (C.D. Ill. 2007). There, the plaintiff defined his class as owners of property on which the defendant installed fiber optic cable without obtaining an easement or the owner's consent. *Id.* at 487. Noting that the defendant should receive a judgment in its favor if it proved either an easement or consent, the Court found the plaintiff's class definition would prevent the entry of "judgment against that particular owner because the owner would no longer fit the class definition." *Id.* at 488. In other words, class members who gave consent would be defined out of the class, denying the defendant the benefit of *res judicata*—just as Levins' definition would do here. *Id.* Levins' class fails for the same reason.

### B.   Levins Cannot Serve as a Class Representative Because She Is Not a Member of the Class She Seeks To Certify.

The typicality prerequisite under Rule 23(a)(3) requires that the court must find the claims or defenses of the representative parties are typical of the claims or defenses of the class. *See* Fed.R.Civ.P. 23(a)(3). As applied here, this means to have "standing as a class representative, the plaintiff must be part of the class…." *See In re Potash Antitrust Litig.*, 667 F.

Supp. 2d 907, 924 (N.D. Ill. 2009), *aff'd upon reh'g en banc sub nom. Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012). Levins is not an adequate representative because she is not a member of the class she seeks to certify.

For purposes of her class certification motion, Levins purports to litigate only nineteen calls to her 6074 number out of the "hundreds" of calls she complains she received "despite numerous requests to stop" (*see* Pl.'s Mem., at 10-11), leaving those other calls to be pursued individually, if at all. However, Levins excludes from her class definition individuals who gave consent before Santander called their cell phone numbers "as reflected in Santander's records." (Motion at ¶ 4.) As set forth above, those records show that Santander's associate spoke to Levins when she called in and the 6074 number was "captured" and, pursuant to Santander's procedures, confirmed that it was her home number and a good number at which to contact her. (*See* Ex. 4, ¶¶ 33-36; *see also* Sec. II.C. *supra*.) Accordingly, Santander's records "reflect" that Levins consented to Santander calling her 6074 number and, as such, Levins falls outside her own class definition.

The typicality requirement ensures that the named representative's claims "have the same essential characteristics as the claims of the class at large." *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006) (internal quotations omitted). Levins fails to establish this prerequisite to certification. *See* Fed.R.Civ.P. 23(a)(3). Because Levins' TCPA claim falls outside the class definition, she does not share "the same essential characteristics as the claims of the class" and cannot meet the typicality requirement.

Levins is also inadequate to serve as a class representative under Rule 23(a)(4), which requires that "the representative parties will fairly and adequately protect the interest of the class." Fed.R.Civ.P. 23(a)(4). While the adequacy and typicality requirements "tend[] to merge,"

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997), the focus is on "the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011).

Here, Levins will be preoccupied defending Santander's Motion for Summary Judgment and, even if she can survive that motion, litigating her own consent claims by disputing the meaning or "accuracy" of Santander's records. This incentive is at odds with the class, whose members are *per se* bound to accept the meaning of those records—based on Levins' class definition. *See Johnson v. Yahoo!, Inc.*, No. 14 CV 2028, 2016 WL 25711, at *5 (N.D. Ill. Jan. 4, 2016) (holding that one of the named plaintiff's claims was not typical and that she would not be an adequate representative because the defendant had evidence of consent to text her); *Kaye v. Amicus Mediation & Arbitration Grp., Inc.*, 300 F.R.D. 67, 79 (D. Conn. 2014) (holding that plaintiff's claims were typical only of those class members whose phone numbers were obtained by the defendant in the same way plaintiff's phone number was obtained because for the other subclasses generalized proof was lacking).

Levins' claims are not typical of the class and she cannot adequately represent the class, because she does not fall within the class definition and is subject to an individualized defense. On these grounds alone, her Motion fails and must be denied. *See* Fed.R.Civ.P. 23(a)(3), (4).

### C.     Levins Cannot Establish Commonality as Required by Rule 23(a)(2).

Commonality requires a plaintiff to show that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2); *Dukes*, 564 U.S. at 349. The plaintiff must demonstrate that the class members have suffered the same injury—not "merely that they have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 350. The class claim must rest upon a

common contention, and that contention "must be of such a nature that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question." *Messner*, 669 F.3d at 815 (quoting *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir. 2005)).

None of Levins' proposed "common" questions can satisfy the commonality requirement. Levins argues that "whether Santander can demonstrate consent is a common question." (*See* Pl.'s Mem., at 20.) Levins admits, however, that "the only individuals in the class are those for whom Santander has no evidence or other indicia of prior express consent." (*Id.*) Thus, absence of consent is a common *characteristic* of the class members, but is not a common *question*, the truth or falsity of which "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Of course, this highlights the circular nature of Levins' proposed definition: Levins argues that consent is a common question, while at the same time her class definition seeks to avoid a trial involving individualized consent determinations. Either consent is not a question to be answered at trial (in which case it is not relevant to the commonality showing required under Rule 23(a)(2)) or consent is at issue, in which case commonality fails for lack of common evidence. *See Dukes*, 564 U.S. at 350; *Balthazor v. Cent. Credit Servs., Inc.*, No. 10-62435-CIV, 2012 WL 6725872, at *5 (S.D. Fla. Dec. 27, 2012) (holding that the plaintiff "fail[ed] to establish commonality because consent is an individualized issue").[5] Levins cannot have it both ways.

---

[5] Levins also contends that whether "Santander's dialing equipment falls within the definition of an ATDS is a common question." As set forth in Santander's Motion for Summary Judgment, however, Santander has several processes for making calls, which invoke different levels of human intervention during the call process. (*See* SOF 49-54.) The degree of human intervention is a relevant factor in

Levins also argues that "whether the Class suffered the same injuries is a common question," but this argument fails as well. As the Supreme Court recently confirmed in *Spokeo, Inc. v. Robins*, 578 U.S. __, 136 S.Ct. 1540, 1548 (2016), to give rise to Article III standing a plaintiff must demonstrate an injury-in-fact that is particularized—*i.e.*, specific to the plaintiff— and concrete—*i.e.*, real, not abstract. As set forth in more detail below, the evidence necessary to prove such an injury for Levins will not be same evidence used to establish injury for other class members, such as those who never received the calls. And Levins seeks treble damages alleging Santander acted willfully but makes no showing that willfulness resulted from some common conduct that would allow for a willfulness determination "in one stroke." *Dukes*, 564 U.S. at 350; Fed.R.Civ.P. 23(a)(2); (*see infra*, Section III.E.2.)

> **D.      Levins' Proposed Class Is Patently Unmanageable and Inferior To Individual Actions, and Levins Fails To Establish that Common Issues Would Predominate in a Class Trial.**

In addition to meeting the requirements of Rule 23(a), Levins bears the burden of showing that "questions of law or fact common to members of the class predominate over any questions affecting only individual members *and* that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3) (emphasis added). A proposed class meets this standard only if it "achieve[s] economies of time, effort, and expense, and promote[s] . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (citing Fed.R.Civ.P. 23 Advisory Comm. Notes).

---

determining whether equipment qualifies as an ATDS (*See 2003 TCPA Order,* 18 FCC Rcd at 14092 (basic functions of an autodialer are to "dial numbers without human intervention."). "How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination." *See TCPA Omnibus Declaratory Ruling and Order*, FCC 15-72 at para. 17. As to any given call, therefore, the answer to the question of whether the call was made using an ATDS will not rely on evidence common to the class.

As stated by the Seventh Circuit in *Mullins*, where a proposed class definition presents difficulties in how a court will ascertain class members, "plaintiff's failure to address the district court's concerns adequately may well cause the plaintiff to flunk the superiority requirement of Rule 23(b)(3)." *Mullins*, 795 F. 3d at 672. The first part of Rule 23(b)(3), *i.e.*, the predominance inquiry, tests "whether proposed classes are sufficiently cohesive," *Amchem,* 521 U.S. at 623, by asking whether "[i]ssues common to the class…predominate over individual issues." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008). A court looks at "the substantive elements of plaintiffs' cause of action and inquires into the proof necessary for the various elements." *Simer*, 661 F.2d at 672. "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Hydrogen Peroxide*, 552 F.3d at 311. Unlike commonality, predominance is significantly more demanding, requiring more than a common claim. *Amchem,* 521 U.S. at 623-24.

Rule 23(b)(3)'s superiority prong further requires a court to take "a close look at the case before it is accepted as a class action" to ensure that proceeding as a class "would achieve economies of time, effort, and expense." *Amchem,* 521 U.S. at 615; Fed.R.Civ.P. 23(b)(3). In determining whether a class action is the superior method of adjudication, courts should consider: (1) the interest of class members in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation already commenced by class members; (3) the desirability or undesirability of concentrating the litigation in the particular forum; and (4) the difficulties likely to be encountered in the management of the class action. Fed.R.Civ.P. 23(b)(3). Moreover, any difficulties likely to be encountered in the management of the class must be compared to the benefits offered by "other available methods" of adjudicating the claims. *See Mullins*, 795 F.3d at 663; Fed.R.Civ.P.23(b)(3).

21

As numerous courts have found, the necessity of conducting an account-by-account review to identify the class members renders the class unmanageable. *See Warnick v. Dish Network LLC,* 301 F.R.D. 551, 557-58 (D. Colo. 2014) (holding that "the proposed class is not administratively feasible because identifying the class members is not a manageable process and would require extensive individual factual inquiry"); *see also Gannon v. Network Tele. Servs., Inc.,* No. 12–9777, 2013 WL 2450199, at *4 (C.D. Cal. June 5, 2013), *aff'd,* 628 F. App'x 551 (9th Cir. 2016) (holding that the manageability issues associated with ascertaining the proposed TCPA class, which excluded individuals who consented to the texts, prevented a finding of predominance and superiority).

    1.    **Levins Cannot Establish that a Class Action Would Be Superior To Individual TCPA Cases.**

    a.  **Identification of Class Members Is Unmanageable.**

During the putative class period (*i.e*., December 2007 to present), Santander made at least one outbound call to roughly 5.5 million customer accounts. (Ex. 4 at ¶ 5.)

To determine whether and how many dialer calls Santander made to telephone numbers associated with those accounts presents the first road block in determining membership in Levins' proposed class. Santander has made both manual and dialer calls to telephone numbers during the class period, recording the calls in its My Sup records on an account basis. (*Id*. at ¶¶ 7-8.) During the early part of this eight-year period, Santander identified calls in those records simply as "outgoing" calls with no reference to the type of call made. (*Id*. at ¶ 9.) In later years, Santander records reflect call-type information in the activity notes. (*Id*.) Thus, to determine those to whom an Aspect dialer system call was made implies a substantial undertaking in and of itself, and even then will not result in a clear identification of all such telephone numbers. (*Id*.)

To determine whether an individual provided a given number in a credit application or financing or other miscellaneous documents, would require yet another manual, page-by-page review of those documents. (*Id*. at ¶¶ 13-14.) A further account-by-account review of the online activity notes associated with each of the 5.5 million customer accounts would be required to determine whether Santander had documented consent to call a number in a telephone call or other written communication. (*Id*. at ¶¶ 15-16.) Santander's records also do not provide any way to accurately determine if the telephone number called is a cell phone number: although the records reflect "cell" information, that designation indicates only that a customer or caller identified a number as a "cell" phone. (*Id*. at ¶¶ 10-11.) But customers often describe cell phones as "home" or "work" numbers, or fail to inform Santander when they port landlines to cell phone service. (*Id*. at ¶ 10.) Associates recording this information also use terms such as "mobile" or "MBL" to describe cell phone numbers, thus further complicating any effort to weed out non-cell phone numbers. (*Id*.)

Santander's records do not identify telephone account subscribers either. (*Id.* at ¶ 12.) Levins' proposed class claims could not be adjudicated until a further determination was made as to the identity of the subscriber to each number at issue, at the time each call at issue was made, and which calls were made following consent (so that those individuals could be excluded from the class). (Aron Report at 5.)[6] Indeed, the Espejo call history illustrates this problem. Although Mr. Espejo is the plaintiff, the calls at issue in that case were placed in connection with *Mrs*. Espejo's account, and a review of that account therefore would be required to identify Mr. Espejo. A similar review of every class member's account would be required to determine those

---

[6] Plaintiffs' prior classes included both "primary users" and "subscribers" to phone numbers at issue—but Levins' new definition is limited to named "subscribers" only. Dr. Aron's analysis applies with even more force here, however, where Levins fails to propose any means of identifying the named subscriber to a given telephone number at the time a call was made to that number, or of confirming that the called party and subscriber were the *same* individual in order to fit within Levins' class definition.

instances where the called party was someone other than the named account-holder. And, as described by Dr. Aron, even that individualized review would not reveal whether the called party was the named "subscriber" to the number called—a requirement of Levins' new class definition—particularly at a given point in the past when a call was placed to that number. (*See id.* at 5-6.)

As Levins further wants to eliminate numbers subject to arbitration agreements or releases, Levins or this Court would further have to look at such provisions in the financing documents, as well as later executed agreements such as loan modifications, and then match those telephone numbers to the numbers called, in order to begin to ascertain class membership. (Ex. 4 at ¶¶ 21-22.) Customers with arbitration provisions would be excluded from the class, but calls to other individuals in connection with the account require further review, as the Espejos' case proves.

Plaintiff contends that "almost three million individuals were called by Santander or on its behalf, on numbers not provided in the loan applications." (Pl.'s Mem. at 17.) However, the general approximations cited by Plaintiff do not eliminate the requirement to manually review each account on a call-by-call basis to determine whether the customer (1) had provided their cell phone numbers in connection with the debt transaction, (2) had otherwise provided Santander with oral or written consent to call that number, (3) was the "subscriber" on the account for the called number, (4) had a contract containing an arbitration clause, (5) filed his or her own individual TCPA lawsuit, or (6) previously released any claims against Santander.

Lastly, simply because Santander identifies a number in the Activities Notes as an IVR-captured number does not mean Santander did not have permission to call that number. (Ex. 4 at ¶¶ 27-30.) As with Levins, consent may be obtained at the same time the number is "captured,"

24

assuring that subsequent calls are made with consent. Indeed, associates record such consent to call IVR-sourced numbers in various ways in the Activity Notes (*e.g.*, home, work, cell). Also, the fact that a number is "captured" does not confirm that no consent exists for that number in account documentation maintained outside My Sup. (*Id.* at ¶ 30.) Again, each account would need to be reviewed to determine whether Santander, in accordance with its policies, obtained consent to call an IVR-sourced phone number before using that number to make a dialer call.

Thus, identifying the telephone numbers for which Santander had consent to call, and are otherwise excluded from Levins' putative class, is an extraordinarily involved and layered process, and Levins proposes no methodology for such an undertaking. When Santander undertakes such a review in response to individual TCPA claims, such reviews can take experienced Santander personnel from 6 to 8 hours per account. (*Id.* at ¶ 23.) Doing so with regard to 5.5 million accounts, would cost tens of millions of dollars, and take years to accomplish. (*Id.*)

Levins for her part fails to propose any methodology for identifying individuals and phone calls implicated by her class definitions. Having abandoned Mr. Jorgensen, her proposed expert on this issue, Levins merely argues that the "path to certification here lies in Santander's own records," suggesting the Court will find the "source" of each phone number and "whether the number called was verified by the customer prior to being called" in such records. (Pl.'s Mem., at 1.) But that says nothing about how Levins plans to extract such information from the millions of records she would have to review to identify her putative class, or how she expects the Court to undertake the work either. Such an unsupported "assurance to the court that [Levins] intends or plans to meet the requirements [of Rule 23] is insufficient." *See Hydrogen Peroxide* 552 F.3d at 318.

Under the circumstances here, and because Levins has no plan and can put forward no plan, the analysis set forth in *Mullins* dictates that her class cannot be certified. *Mullins*, 795 F.3d at 663-64.

### b. Individuals Have the Necessary Incentive to Bring TCPA Claims.

The fact that members of a putative class have sufficient incentive to bring individual claims further undermines a request for class certification under the Rule 23(b)(3) superiority analysis. *Vigus v. S. Illinois Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 238 (S.D. Ill. 2011). The nature of the TCPA's statutory damages scheme—$500 for every negligent violation and $1,500 for every willful violation—gives individual plaintiffs ample incentive to bring their own individual claims. Indeed, courts have recognized that "[t]he statutory remedy is designed to provide adequate incentive for an individual plaintiff to bring suit on his own behalf." *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Pa. 1995); *see also Vigus,* 274 F.R.D. at 238 (noting that punitive class members in TCPA actions would have a superior remedy in more speedy venues such as, for example, a small claims court). And the legislative history of the TCPA demonstrates that Congress provided the substantial statutory damages so that consumers could bring claims on an individual basis. 137 Cong. Rec. 30,821-30822 (1991) (statements from the TCPA's sponsor explaining the intent that consumers to bring the claims in small claims court so that they could appear without an attorney). Thus, the TCPA was designed with ample incentive for consumers to pursue individual actions.

Both the Edelson and Davis & Norris firms represent parties who either have filed or are currently pursuing individual TCPA cases against Santander, including the *Espejo*, *Humphreys* and *Johnson-Morris* matters brought before this Court. (Pietrkowski Decl. at ¶ 16.) The Edelson firm also has represented consumers in at least nine TCPA individual arbitrations initiated against Santander. (*Id.* at ¶ 17.) Similarly, the Davis & Norris firm has filed at least 11 other

individual TCPA lawsuits against Santander, and has initiated more than 200 TCPA consumer arbitrations against Santander. (*Id.* at ¶¶ 18-19.)[7] Levins does not address any of these parallel cases, let alone explain how a class action is superior given the pursuit of literally hundreds of individual TCPA actions against Santander by the same Plaintiff's counsel in this case.

### c. The Potential Class Remedies Lack Proportionality.

Yet another factor weighing against superiority is the lack of proportionality of Santander's potential liability to the harm suffered by putative class members. Although the defendant's economic harm is not an element of the alleged statutory violation, courts can consider such harm when analyzing superiority. *See London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1255 n.5 (11th Cir. 2003). As class actions can be used to create "blackmail settlements," a district court should consider the enormous size of the potential liability in conjunction with Rule 23(b)(3)'s factors. *In the Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1298-99 (7th Cir. 1995).

Here, just to identify the a putative class Levins seeks to certify will result in the irrational expenditure of resources and material disruption of Santander's business, with no showing that this monumental undertaking will yield enough class members to even begin to justify the burdens associated with their identification.[8] The unmanageability of a trial requiring

---

[7] Counsels' role in these cases raises questions about those firms' fitness to serve as class counsel here. *See* Fed.R.Civ.P. 23(a)(4). In considering certification "[c]ourts have consistently held that counsel cannot simultaneously represent a class and prosecute either individual or class claims against the same defendants in a different proceeding, even if there is partial overlap among the plaintiffs or class members in the cases." 1 McLaughlin on Class Actions § 4:39 (12th ed. 2015) (footnote omitted). In considering the competence of class counsel, such parallel representation is also relevant because where counsel represents individual plaintiffs in a parallel action, potential class members are at risk that counsel will "trade off the interests of certain of its clients to the detriment of other clients." *Kurczi v. Eli Lilly & Co.*, 160 F.R.D. 667, 679 (N.D. Ohio 1995) (holding that class counsel were not adequate to represent class where prosecuting parallel individual actions).

[8] Indeed, just as Levins fails to identify a methodology for identifying individuals who fit her class definition, she similarly fails to prove by a preponderance of the evidence that the class is "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). (Levins' suggestion that Santander

the presentation of consent evidence related to potentially millions of calls only further adds to the *in terrorem* effect of Levins' proposed class. Such a proportionately unfair procedure cannot satisfy the requirements of Rule 23(b)(3).

> **2.      Individual Issues Would Predominate over Common Questions in a Class-Wide Trial of this Action.**

The individualized determinations necessary to identify membership in Levins' putative class, and whether they have a viable claim, would overwhelm any proposed class trial. "A critical need is to determine how the case will be tried." *Hydrogen Peroxide* 552 F.3d at 319 (quoting Fed.R.Civ.P. 23 Adv. Comm. Note, 2003 Amendments) (internal quotations omitted).

In a TCPA case, where "the defendant sets forth specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cellphone," consent presents an individualized question that will overwhelm any common issue presented. *See Jamison v. First Credit Servs.*, 290 F.R.D. 92, 106-07 (N.D. Ill. Mar. 28, 2013) (citing cases). In *Jamison*, the defendant submitted an affidavit attesting to the defendant's common practice of obtaining verbal consent, and recording "preferred" contact numbers in unsearchable "notes" field of defendant's account records system. *Id.* at 107. Such evidence, in turn, demonstrated that the defendant had "elicited consent to call a large percentage of potential class members on their cellphones," and thus the need "to conduct a series of mini-trials to determine the population of the class and to determine liability." *Id*. Given the absence of any "way to

---

has somehow conceded numerosity is unavailing where the discovery at issue was with respect to a class definition Levins has since abandoned in favor of one that clearly puts numerosity at issue.) Levins posits that the class "likely" consists of "hundreds of thousands of members" (Pl.'s Mem. at 1), or that it is "overwhelmingly likely" to consist of "thousands" of individuals. (*Id*. at 17.) Neither of these assertions is supported by any evidence. "Mere speculation as to the number of class members—even if such speculation is "a bet worth making"—cannot support a finding of numerosity." *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 357 (3d Cir. 2013) (holding that numerosity was not established where the defendant's records failed to show the number of transactions with "the specific problem involved in this litigation"); *see also Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 596 (3d Cir. 2012) (district court's speculation that "common sense indicates that there will be at least 40" was an abuse of discretion).

28

employ generalized proof to show consent, or lack thereof," the court held that the plaintiff had failed to demonstrate that individual issues predominated of common ones. *Id.*

Various other courts have come to the same result. *See, e.g., Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008) (reversing trial court's decision to certify class because the issue of consent was an individual issue that predominated over common issues where the source of the fax numbers varied, so consent could not be proven in a generalized manner); *Connelly*, 294 F.R.D. at 578 (finding that the predominance requirement was not satisfied because the defendant had obtained the cell phone numbers it called from a variety of different sources); *Gannon,* 2013 WL 2450199, at *2–3 (finding the issue of consent prevented the predominance requirement from being met); *Conrad v. Gen. Motors Acceptance Corp.*, 283 F.R.D. 326, 330 (N.D. Tex. 2012) (denying certification because consent was an individual issue as it was obtained in a variety of ways and there was no generalized method of proof); *Versteeg v. Bennett, Deloney & Noyes, P.C.*, 271 F.R.D. 668, 674 (D. Wyo. 2011) (denying class certification because "the TCPA claims will require extensive individual fact inquiries into whether each individual gave 'express consent' by providing their wireless number to the creditor during the transaction that resulted in the debt owed[.]"). Indeed, Levins fails to cite a single TCPA case where a class was certified despite individual consent issues being presented.

Identifying the cell numbers called, the subscribers of those numbers, and whether Santander had consent to call those numbers—consent Santander routinely obtains pursuant to its robust TCPA compliance system—would require individualized analysis of each customer's account records as detailed in the prior section. Simply put, there is no practical difference between trials of class members to determine whether they are entitled to relief, on the one hand, and individualized determinations necessary to identify who is in the class (and, therefore,

entitled to relief), on the other. The Court further will need to permit Santander the opportunity to cross-examine individual class members who may provide testimony confirming their prior express consent, much as Espejo's deposition testimony confirmed his oral consent to be called. Under these circumstances, the issue of consent to receive a specific call at a specific time is an individual issue that precludes class certification.

Moreover, although Levins' proposed class definition would foreclose individuals, including Levins, from challenging the accuracy of Santander's records, it cannot prevent Santander from asserting consent even in the face of records that do not "reflect" consent. Given Santander's compliance program, a dialer call reflected in its records as being made without consent could happen only if there was a failure to adhere to Santander's requirements that consent be obtained and recorded before dialer calls are made. However, it is no more likely the call was made without consent than consent was obtained but not recorded in Santander's records as required. To address which of the two possibilities applied would implicate the right to examine putative class members on the issue of consent.

Furthermore, the prospect of adjudicating statutory damages awards would also require a determination of whether each call constituted a negligent or willful violation of the statute—particularly since a finding of willfulness trebles the award. *See* 47 U.S.C. 227(b)(3). The issue of willfulness cannot be adjudicated without mini-trials here because Santander had a policy of obtaining consent, and each class member therefore would bear the burden of proving that Santander willfully disregarded the requirements of the TCPA with respect to the calls made to them. *Jamison*, 290 F.R.D. at 107. If nonconsensual calls were identified, there is no reason to expect that they would uniformly flow from some particular scenario. Certainly Levins makes no

showing to that effect and, to the contrary, there is every reason to conclude that such scenarios would vary.

Finally, Santander's defense based on lack of Article III standing also implicates individualized treatment. Whether a call that does not connect, is blocked, is not answered or answered only by an answering machine implicates a potentially individualized analysis as to whether such calls constitute the actual, concrete injury necessary for Article III standing.

Taken together, the potential for "mini-trials" on these issues alone is enough to defeat certification. *Jamison*, 290 F.R.D. at 106-07. For all of these reasons, Levins fails to demonstrate that her proposed classes meet the requirements of Rule 23(b)(3). Fed.R.Civ.P. 23(b)(3).

## IV. CONCLUSION

Levins' Motion demonstrates nothing more than the fact that her proposed class is wholly implausible. By constructing a fail-safe shield around consent, and relying on the facts "as reflected in Santander's records," Levins has pleaded herself out of her own class. She further would have this Court engage in millions of individualized mini-trials on the issue of consent either to identify class members in the first instance, or to adjudicate their claims on the merits. Either way, Levins proposes no methodology for this mammoth undertaking, and even abandons the "expert" who was supposed to provide the roadmap. The fact that a class trial is not feasible stands in contrast to the benefits of individual TCPA actions that Levins' attorneys are pursing, and have pursued, on behalf of onetime-class representative Henry Espejo and multiple others, and, to at least with regard to some calls, that Levins continues to proceed with here as individual claims.

Levins' Motion fails to establish the prerequisites for certification under Rule 23(a), or otherwise satisfy the requirements of Rule 23(b). The Motion should be denied.

31

Dated: June 13, 2016                    Respectfully submitted,

                                        **SANTANDER CONSUMER USA, INC.,**
                                        *Defendant*

                                        By: _____s/ James A. Rolfes_____
                                                   One of Its Attorneys


James A. Rolfes                  Abraham J. Colman              Marc A. Lackner
(Bar No. 6200271)                *pro hac vice*                 *pro hac vice*
*jrolfes@reedsmith.com*          *acolman@reedsmith.com*        *mlackner@mcguirewoods.com*
Henry Pietrkowski                REED SMITH LLP                 David S. Reidy
(Bar No. 6230048)                355 South Grand Avenue         *dreidy@mcguirewoods.com*
*hpietrkowski@reedsmith.com*     Los Angeles, CA 90071          McGUIRE WOODS LLP
REED SMITH LLP                   (213) 457-8000                 505 Sansome Street, Suite 700
10 South Wacker Drive                                           San Francisco, CA 94111
Chicago, IL 60606                                               (415) 844-1974
(312) 207-1000