# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| HENRY ESPEJO, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 11 C 8987 |
| v. | ) ) | |
| | ) | Judge Charles P. Kocoras |
| SANTANDER CONSUMER USA, INC., an Illinois corporation | ) ) ) | |
| Defendant. | ) | |
| FAYE LEVINS, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 12 C 9431 |
| v. | ) ) | |
| | ) | Judge Charles P. Kocoras |
| SANTANDER CONSUMER USA, INC., an Illinois corporation | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

CHARLES P. KOCORAS, U.S. District Judge:

Now before the Court are Defendant Santander Consumer USA, Inc.'s Motions for Summary Judgment in Case Nos. 11-cv-8987 and 12-cv-9431, and Plaintiff Faye Levins' Motion for Class Certification in Case No. 12-cv-9431. For the reasons below, Santander's Motion for Summary Judgment in Case No. 11-cv-8987 is denied, Santander's Motion for Summary Judgment in Case No. 12-cv-9431 is granted in part, and Levins' Motion for Class Certification in Case No. 12-cv-9431 is denied.

## BACKGROUND

These consolidated class actions raise claims against Defendant Santander Consumer U.S.A., Inc. ("Santander") by two Plaintiffs (Henry Espejo and Faye Levins) for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*. Espejo's class action was originally filed against Santander in this district on December 19, 2011, by a different plaintiff (Tercia Pereira) alleging violations of the TCPA individually and on behalf of a putative nationwide class and sub-class. *See* Dkt. 1 in Case No. 11-cv-8987 ("8987 Dkt."). By stipulation of the parties, an amended complaint followed on August 8, 2012, substituting Espejo as the plaintiff in that case, individually and as the new representative of the same nationwide class and sub-class. *See* 8987 Dkts. 27-30.

Meanwhile, on June 5, 2012, a different plaintiff (Arica Bonner) filed a separate action against Santander in the Northern District of Alabama, alleging violations of the TCPA and other claims. *See* Dkt. 1 in Case No. 12-cv-9431 ("Dkt."). An amended complaint followed there as well, adding Levins and seven other plaintiffs, again individually and on behalf of a putative nationwide class. *See* Dkt. 4. Following the dismissal of five of those plaintiffs, the action was transferred to this district by consent of the remaining parties, and then reassigned to this Court as related to Espejo's action in December 2012. *See* Dkts. 15, 25, 29, 33, 36-37. All other plaintiffs and claims in Levins' action were then voluntarily dismissed (*see* Dkts. 78, 82, 90), leaving only Levins' and Espejo's TCPA claims, individually and on behalf of putative nationwide classes and subclasses in both cases.

Both Plaintiffs claim that Santander dialed their respective cell phone numbers to contact them regarding their outstanding auto loans in violation of the TCPA. According to Espejo and Levins, such calls by Santander violated the TCPA because they were made using an automatic telephone dialing system ("ATDS") without first obtaining Espejo's or Levins' consent to contact them at those numbers. *See* Dkt. 123, at 1. Santander disputes both assertions—that it lacked consent to contact Espejo and Levins at the cell phone numbers at issue, and that it used an ATDS system to do so−and now seeks summary judgment in its favor on the TCPA claims against it in both actions on both of these grounds. *See* Dkt. 94. Levins, in turn, seeks certification of her alleged nationwide class and subclass pursuant to Fed. R. Civ. P. 23(b)(3). *See* Dkt. 100. For the following reasons, Santander's motion for summary judgment is granted as to one of Levins' three telephone numbers (the 6954 number); Santander's motions for summary judgment are otherwise denied; and Levins' motion for class certification is also denied.

## DISCUSSION

## I. Santander's Motions for Summary Judgment

As both sides agree, Santander's liability under the TCPA depends on whether: (1) it had obtained each Plaintiff's consent to be contacted at the cellphone numbers at issue, and (2) it used an ATDS to make those calls. Dkt. 96, at 6, 12; Dkt. 123, at 6. As explained below, each Plaintiff's consent is disputed with respect to one or more of the numbers at issue, and Santander has failed to show that its "Aspect Telephone System" is not an ATDS under current law. Summary judgment is thus precluded.

3

### A. Consent

There is no dispute that Santander contacted Levins at three different cellphone numbers (ending in 6954, 9678, and 6074) to inquire about her outstanding auto loan. Dkt. 124, ¶ 34. It is also undisputed that Levins had previously consented to being contacted at the 6954 number, by listing that number on her credit application. *Id*. at ¶¶ 35-37. Santander's motion for summary judgment on Levins' TCPA claim is therefore granted as to the 6954 number. Contrary to Santander's insistence, however, Levins' consent to be contacted at the remaining two numbers is plainly disputed.

As to Levins' 9678 number, both sides agree that Santander placed four calls to that number (on May 4, 7, 10, and 14, 2012) *before* Levins gave Santander her consent for that number on May 14, 2012. Dkt. 124, ¶¶ 38-39. As to these four calls, Santander has failed to show "the prior express consent of the called party" required by 47 U.S.C. § 227(b)(1)(A). The parties also agree that Santander placed nineteen calls to Levins' 6074 number between June 20 and August 11, 2009, but again dispute whether these calls were made "without her permission." Dkt. 138, ¶ 6. For its part, Santander points to an agent's "activity notes" of a call it received from this number on March 27, 2009, which include the notation "IVR1's Home." *Id*. at ¶ 3. According to Santander, such a notation indicates that "Levins had informed the agent that this 'home' telephone number was a good number on which to contact her." Dkt. 124, ¶ 44. But Levins contends that later activity notes dated August 12, 2009, stating that "verifications were required for Faye Levins and were completed" on that date, indicate her first consent for Santander to use her 6074 number. Dkt. 123, at 3.

4

To support this contention, Levins points to Santander's admission that an indication that "verification was performed" in an agent's activity notes "signifies that a customer confirmed to the Santander associate that the customer's contact information is correct." Dkt. 138, ¶ 5. From this, Levins argues that Santander's activity notes suggest that no "verification" for her 6074 number was performed before August 12, 2009—when "verifications were required for Faye Levins and were completed"—since Santander's earlier March 27 activity notes state that "no verifications were required," suggesting that none were performed at that earlier time. Dkt. 123, at 3, 8-9 (asserting an "utter lack of clarity on this issue"). Santander attempts to defuse this factual dispute by explaining that "verifications only were required when an account was a certain number of days past due," and "[e]ven though 'no verifications were required' on March 27, 2009, the notes indicate that the agent did ask her on that call whether the 6074 number was a 'home' number and whether it was a good number to contact her." Dkt. 138, ¶ 3. But the documents are inconclusive on this point. In short, the Court cannot conclude on summary judgment, where reasonable inferences must be drawn in Levins' favor (or on class certification, where such individualized consent issues similarly predominate, as discussed below) that Santander's records conclusively establish the fact or timing of the called party's consent to be contacted in the future.

The record regarding Espejo's consent to be contacted at his 1411 number is similarly controverted. Santander claims (and Espejo disputes) that on November 4, 2009, "Mr. and Mrs. Espejo together made a call to Santander using the 1411 telephone number," "Mrs. Espejo agreed that Santander could talk to Mr. Espejo about her debt,"

and "Santander obtained Mr. Espejo's confirmation that the 1411 telephone number was the appropriate telephone number at which to reach him." Dkt. 124, ¶¶ 13-17. Santander bases this latter contention of Espejo's consent to be contacted at his 1411 number on the following deposition testimony about his conversations with Santander:

> Q. Did they ever say in sum and substance, is this a good contact number for you, Mr. Espejo?
>
> A. Oh, for me?
>
> Q. Yes.
>
> A. Yeah, they would ask me, Can we call you on this number?
>
> Q. What did you say?
>
> A. I said yes. I mean, it's my number.

Dkt. 126-5, at 74; Dkt. 124, ¶ 16 (citing same).

Espejo argues that this testimony is "vague and inconclusive." Dkt. 123, at 10-11. He points out that it is "unclear when this conversation occurred," and insists that "he was only affirming that the -1411 number was his phone number, not that Santander could call him on it," *id*., as he later clarified in the same deposition:

> Q. Do you remember counsel asking you a question about whether someone from Santander had said, Can we contact you on that number? Do you remember him asking you that?
>
> A. Yes.
>
> Q. Do you remember what you said in response to that?
>
> A. No, they can't contact me on that number. Two different questions.
>
> * * *
>
> Q. When they asked you, is this your contact number, you answered "yes"?

6

A. Yes, this is Henry Espejo.

Q. You meant that that was your number?

A. Yes. That was my number.

Q. When they asked you, Can we contact you on this number, did you say "yes"?

A. No.

Q. Would you have said "yes"?

A. No.

Q: Did you ever want Santander to contact you on that phone number?

A: No.

Q. So you misunderstood his question, then, if you said "yes" to that?

A. Yes, yes. I would – that's what I meant, you know.

Dkt. 126-5, at 137-38; Dkt. 124, ¶ 16 (citing same).

Once again, Santander attempts to defuse this factual dispute, this time arguing that Espejo's later deposition answers to his own lawyer's questions, after first "taking a break with his lawyer," are not "credible." Dkt. 136, at 10-11. But credibility determinations are for a factfinder. *McCann v. Iroquois Mem. Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) ("The court may not weigh the evidence or decide which testimony is more credible.") Nor is there any "evidentiary ban on conflicting testimony." *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 687 (7th Cir. 2015). Where (as here) "the change is plausible and the party offers a suitable explanation such as confusion, mistake, or lapse in memory, a change in testimony affects only its credibility, not its admissibility." *McCann*, 622 F.3d at 751 (citations, internal quotation marks omitted).

7

And in any event, as Espejo correctly argues, the testimony on which Santander relies so heavily is non-specific as to the date on which Espejo supposedly consented to being called on his 1411 number. *See* Dkt. 126-5, at 74 ("Did they ever say . . . ?"). It therefore fails to establish "the prior express consent" that the statute requires. *See* 47 U.S.C. § 227(b)(1)(A). Nor does it address Espejo's additional testimony claiming that he repeatedly asked Santander ***not*** to call him on that number. *See* Dkt. 126-5, at 97, 143-44. And while Santander similarly dismisses these claims as incredible, uncorroborated, and inconsistent with its records (Dkt. 96, at 10; Dkt. 136, at 10-12; Dkt. 138, ¶ 17), these criticisms once again go to its weight—which a factfinder must assess—not its admissibility or sufficiency to create a factual dispute.

**B.     ATDS**

Santander's alternative ground for summary judgment asserts, not the consent of the called parties, but the equipment it used to call them. Santander argues that its "Aspect Telephone System" does not constitute the ATDS (automatic telephone dialing system) required to trigger liability under the TCPA for two reasons: (1) it "lacked the capacity to dial numbers stored or produced by a random or sequential number generator – an express statutory requirement of an ATDS," and (2) it "relied on customer service agents clicking buttons to dial Espejo's and Levins' cell phone numbers from a manually assembled list – human intervention that takes Santander's telephone system outside the ATDS definition." Dkt. 96, at 1. According to Santander, both features are independently "fatal to Plaintiffs' TCPA claims." *Id*. The Court disagrees.

8

As for the "human intervention" required by Santander's Aspect system, its own description of that system reveals that there is little to speak of. According to Santander, its "dialer operations team" "uploads" a "file" containing a "criteria-generated list" of telephone numbers derived from factors "such as account behavior scores, account balances, new loan status, days past due and amounts past due." Dkt. 96, at 5. And "when agents log-in and press buttons indicating their availability," the Aspect system's "dialer" "responds to these agent-initiated signals by dialing numbers from the uploaded list, using an algorithm designed to efficiently match available agents to answered calls." *Id*. Thus, according to Santander's own description, its Aspect "dialer"—not the agents—makes the calls "by dialing numbers from the uploaded list." That "*some* act of human agency occurs at some point in the process" does nothing to place Santander's automated "dialer" beyond the TCPA's reach, since a person "will always be a but-for cause of any machine's action." *See In re Collecto, Inc.*, 14-MD-02513-RGS, 2016 WL 552459, at *4 (D. Mass. Feb. 10, 2016) (emphasis in original); *Johnson v. Yahoo!, Inc.*, No. 14 CV 2028, 2753, 2014 WL 7005102, at *5 n.10 (N.D. Ill. Dec. 11, 2014)). As the *Johnson* court explained,

> Every ATDS requires some initial act of human agency – be it turning on the machine or pressing "Go." It does not follow, however, that every subsequent call the machine dials – or message it sends – is a product of that human intervention. There is some evidence to suggest that [defendant's system] can pull numbers and dial them without a person ordering a specific system message. . . . That is sufficient to defeat Yahoo!'s motion for summary judgment.

*Johnson*, 2014 WL 7005102, at *5. So too here.

9

Santander's second ground for distinguishing its Aspect "dialer"—that it "lacked the capacity to dial numbers stored or produced by a random or sequential number generator"—is also insufficient. Indeed, there is no dispute that Santander's Aspect "dialer" functions as a "predictive dialer," which the Federal Communications Commission has ruled constitutes an ATDS for purposes of the TCPA, regardless of whether it uses "a random or sequential number generator" as recited in the TCPA. *See* Dkt. 96, at 12-13; Dkt. 123, at 12-15; Dkt. 136, at 13-15; Dkt. 138, ¶¶ 23-24. As a sister court recently explained:

> The TCPA defines an autodialer as "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). In 2003, the FCC explained that while previous autodialers generated random numbers to call, "the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective." *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14092 (2003). So a predictive dialer, which "has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers," *id*. at 14091, "constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers," 23 F.C.C. Rcd. at 566. In other words, an autodialer "has the specified capacity to generate numbers and dial them without human intervention ***regardless of whether the numbers called are randomly or sequentially generated or come from calling lists.***" *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 15391, 15932 n.5 (2012).

*Wright v. Nationstar Mortg., LLC*, No. 14 C 10457, 2016 WL 4505169, at *10 (N.D. Ill. Aug. 29, 2016) (emphasis added). Santander nevertheless asks the Court to disregard these FCC rulings, but Seventh Circuit authority squarely precludes such a departure.

10

Even Santander concedes that the Hobbs Act requires this Court to "give weight" to these FCC rulings. Dkt. 96, at 13; *see also* 28 U.S.C. §§ 2341 *et seq*. The Seventh Circuit has reinforced this requirement, admonishing that the Hobbs Act "reserves to the courts of appeals the power 'to enjoin, set aside, suspend (in whole or in part), or to determine the validity of' all final FCC orders." *C.E. Design Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446, 449 n.5 (7th Cir.2010) (citing 28 U.S.C. § 2342(1) and 47 U.S.C. § 402(a)). District courts within this circuit have heeded this warning in cases challenging the very FCC rulings that Santander contests here,[1] including in a case against Santander itself, where the court described its argument urging rejection of this FCC interpretation as "perilously close to violating Fed. R. Civ. P. 11." *Nelson v. Santander Consumer USA*, 931 F. Supp. 2d 919, 928 (W.D. Wisc. 2013). The *Nelson* court went on to hold that Santander's Aspect dialer is an ATDS within the scope of the TCPA, although that decision was later vacated by stipulation of the parties. *See id*; 2013 WL 5377280, at *1 (W.D. Wis. June 7, 2013). Santander now resists the same holding here, pointing to a more recent appeal of various FCC rulings, including "whether a 'predictive dialer' still must have the requisite 'capacity' to use a random or sequential number generator to be considered an ATDS under the statute." Dkt. 136, at 14 (citing *ACA Int'l v. FCC*, Appeal No. 15-1211 (D.C. Cir. filed July 10, 2015).

---

1 *See, e.g.*, *Schumacher v. Credit Protection Ass'n*, No. 4:13-cv-00164, 2015 WL 5786139, at *6-8 and n.5 (S.D. Ind. Sept. 30, 2015) ("In general, a district court gives great weight, if not controlling weight, to final decisions of the FCC implementing and interpreting the TCPA." (quoting *Sterk v. Path, Inc.*, 46 F. Supp. 3d 813, 819 (N.D. Ill. 2014) (citing *CE Design*)); *Johnson*, 2014 WL 7005102, at *3 ("the TCPA and Hobbs Act bind me to the FCC's interpretation"); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 726 (N.D. Ill. 2011) (same).

Given the both Hobbs Act and Seventh Circuit authority requiring district courts to adhere to final FCC rulings, this Court joins those in this circuit and elsewhere in holding that a predictive dialer such as Santander's Aspect system falls within the scope of the TCPA. *See*, *e.g.*, *Schumacher*, 2015 WL 5786139, at *6-8 (citing cases). This holding disposes of all calls discussed above, including the four calls to Levins' 9678 in May 2012, which both sides agree were made with Santander's Aspect dialer manually, rather than using its "predictive dialer" mode. Dkt. 124, ¶ 39; Dkt. 136, at 2, 9-10. Under the FCC's controlling interpretation, the pivotal inquiry is whether the dialing system had the "capacity" to dial numbers automatically, regardless of whether the calls were made manually or using the system's autodialer or predictive dialer features. *See Johnson*, 2014 WL 7005102, at *5-6; *see also Robinson v. Green Tree Servicing, LLC*, No. 13 CV 6717, 2015 WL 4038485, at *3-4 (N.D. Ill. June 26, 2015) (denying summary judgment on TCPA claim for calls allegedly made manually on Aspect predictive dialer which had the "requisite capacity to act as an ATDS" as construed by the FCC); *see also* 47 U.S.C. § 227(a)(1) (an ATDS "has the capacity . . . to dial such numbers"). That FCC interpretation is dispositive here.

Anticipating this result, Santander urges the Court to stay this action until the D.C. Circuit decides the appeal in *ACA Int'l*. *See* Dkt. 96, at 13 n.3. Santander notes that a "number of federal courts recently have granted motions to stay based on the pendency of the *ACA Int'l* appeal." *Id*. (citing cases). But Plaintiffs oppose any such stay, complaining that Santander "has not shown how a stay serves judicial economy or impacts the balance of hardships to the parties." Dkt. 123, at 15 n.7.

While some courts have taken such a wait-and-see approach, others in this district and elsewhere have come to the opposite conclusion, noting that the delay caused by a stay awaiting the D.C. Circuit's decision "could be substantial," and therefore opting to allow progress in the case, particularly on issues unrelated to that appeal. *See*, *e.g.*, *Konopca v. Ctr. For Excellence in Higher Educ., Inc.*, No. 15-5340, 2016 WL 4644461, at *2-3 (D.N.J. Sept. 6, 2016) (citing cases). This Court takes the latter approach and opts to resolve Plaintiff Levin's Motion for Class Certification, which the Court denies for reasons unrelated to the *ACA Int'l* appeal, as explained below. The Court notes, however, that oral argument in that appeal is scheduled to take place soon, on October 19, 2016. Accordingly, in the event the parties here are unable to resolve Plaintiffs' remaining individual claims, the Court will defer a trial on those claims until the D.C. Circuit issues its decision in *ACA Int'l*, and will revisit any issues affected by that decision as needed, at any time before the trial in this case.

## II. Levins' Motion for Class Certification

Of the multiple plaintiffs joined at the outset of these consolidated actions, only Levins seeks class certification. *See* Dkt. 100. And of Levins' multiple claims and telephone numbers, she seeks class certification only as to her TCPA and only as to the calls Santander allegedly made to her 6074 number "prior to her 'verifying' it as a number at which she could be reached." Dkt. 123, at 2 n.2. Levins maintains that Santander's records show at least thousands of others (potentially hundreds of thousands) who Santander similarly called before "verifying" their consent to be reached at their respective numbers. *Id*.; Dkt. 103, at 1-2, 16-17.

13

"Because a class action is an exception to the usual rule that only a named party before the court can have her claims adjudicated, the class representative must be part of the class and possess the same interest and suffer the same injury." *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 373 (7th Cir. 2015). "The general gate-keeping function of Federal Rule 23(a) ensures that a class format is an appropriate procedure for adjudicating a particular claim by requiring that the class meet the following requirements": (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *Id*. The class must also satisfy at least one of the four conditions in Rule 23(b)—in this case, Rule 23(b)(3)'s requirements "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Dkt. 100 (invoking Rule 23(b)(3)).

"Because Rule 23(a) provides a gate-keeping function for all class actions, ordinarily we would begin there and only turn our attention to Rule 23(b) after we were certain that all of Rule 23(a)'s requirements had been met." *Bell*, 800 F.3d at 374. But in many cases (as here), the requirements of Rule 23(a) and (b) "overlap," and the analyses they require therefore "merge." *Id*. ("commonality and predominance overlap in ways that make them difficult to analyze separately; consequently much of our discussion applies to both issues"); *CE Design, Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 724 (7th Cir. 2011) ("In many cases, including this one, the requirement of typicality merges with the further requirement that the class representative 'will fairly and adequately protect the interests of the class.'").

The class must also meet Rule 23's "implicit requirement of 'ascertainability,'" meaning that it "must be definite enough that the class can be ascertained." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015) (quoting *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006)). And a class may be certified only if the trial court "'is satisfied, after a rigorous analysis, that the prerequisites' for class certification have been met." *Bell*, 800 F.3d at 373 (quoting *CE Design*, 637 F.3d at 723). Importantly, the burden is on the plaintiff "to demonstrate, by a preponderance of the evidence, that they have met each requirement of Rule 23." *Id*. at 376. For the following reasons, the Court concludes that Levins has not met that burden, and her motion for class certification therefore must be denied.

## A. Ascertainability and Numerosity

Levins seeks certification of the following class and subclass:

> **TCPA Class:** All individuals called by Santander or on its behalf, using the Aspect dialer system between December 19, 2007 and the present, on a cellular telephone number to which the individual was the subscriber, and which was not (a) listed in any application for credit or financing submitted to Santander or any of its originating creditors, (b) otherwise volunteered by the individual directly to Santander orally or in writing prior to the time of Santander's first call to that number, ***as reflected in Santander's records***, or (c) verified prior to being called for the first time by Santander, ***as reflected in Santander's records***.

> **Number Trapping Subclass:** All members of the TCPA Class called by Santander or on its behalf, on a cellular telephone number that Santander captured through calls made to its IVR system (as indicated by its identification ***in Santander's records*** with the notation 'IVR' followed by an Arabic numeral (*e.g.*, IVR1, IVR2, etc.)).

Dkt. 103, at 11 (emphasis added).

As reflected in these class definitions, Levins would identify the members of her proposed class and subclass through "Santander's records." Indeed, Levins relies on Santander's records to establish every Rule 23 requirement she must meet. As she puts it, "Santander's own records provide the information necessary to identify Class and Subclass members, and establish that Rule 23's requirements for class certification are satisfied," since "the records show that the Class likely consists of hundreds of thousands of members ('numerosity'), all of whom were in an identical evidentiary position (given that Santander's records establish for each of them the number(s) at which they were called, how the number was called, and whether Santander was authorized to call them at that number) ('commonality' and 'predominance')." Dkt. 103, at 1-2. But these are the same records that Levins and Espejo challenge to save their claims from summary judgment. *See*, *e.g.*, Dkt. 124, ¶¶ 11, 15, 43-44. This poses problems for Levins' proposed class with respect to each Rule 23 requirement she must meet, beginning with ascertainability and Rule 23(a)(1)'s numerosity requirement.

Whereas Levins' proposed class expressly relies on Santander's records to demonstrate whether and when class members "volunteered" their cellphone numbers or "verified" their consent to be contacted at such numbers "prior to being called for the first time by Santander," these are the very facts that both Levins and Espejo disputed could be discerned from Santander's records, in opposition to its motions for summary judgment.[2] Levins herself insists there is an "utter lack of clarity" in Santander's

---

2 *See*, *e.g.*, Dkt. 124, ¶ 11 (relying upon deposition testimony to dispute cited activity notes (*see* Dkt. 98-1, ¶ 13) indicating that Maria Espejo identified 1411 number

records regarding when she first consented to being contacted at her 6074 number, disputing that Santander's activity notes demonstrate her prior consent. *See supra* Part I-A (citing Dkt. 123, at 3, 8-9). According to Levins (citing the deposition testimony of a Santander witness), "there's no way from looking at the notes" to "tell how this conversation went." Dkt. 124, ¶¶ 15, 43-44; Dkt. 125, ¶ 28; Dkt. 123, at 9.

The parties also dispute the content of Santander's activity notes in other respects, advancing contradictory interpretations of what they say and what they don't. For instance, Santander maintains that "nothing" in its activity notes "indicates that Levins ever made a request to stop all calls to any of her cell phone numbers," Dkt. 124, ¶ 47, whereas Levins contends that an entry stating that she "kept hollering" at an agent indicates a lack of consent to be contacted at her 9678 number, though Santander insists the entry "does not say anything contrary to Santander obtaining consent." Dkt. 138, ¶ 8. And then there are Espejo's allegations about what is missing from Santander's records—namely, his alleged revocations of any consents previously provided. *See*, *e.g.*, Dkt. 124, ¶¶ 18-19 (asserting Espejo's do-not-call requests not reflected in "Santander's contemporaneous records"). Plaintiffs even dispute whether Santander had a "policy requiring agents to record 'do-not-call' requests," and whether "the existence (alone) of such a policy" would "be dispositive of whether the agent followed that policy during or after the call in question." Dkt. 124, ¶ 19.

---

as her home number and verified it as an appropriate number on which to contact her); *id.* at ¶ 15 (disputing that designation "IVR1's Home" in activity notes "means that verifications occurred"); *id.* at ¶¶ 43-4-4 (disputing activity notes indicating that Levins identified 6074 number as her home number and an appropriate number to contact her).

Plaintiffs themselves thus challenge the content, clarity, accuracy, and completeness of the very records on which Levins would base class certification, on the very points needed to determine class membership. And while some of these arguments concern calls other than those made to Levins' 6074 number ("the only calls upon which Levins bases her request for class certification," Dkt. 123, at 2 n.2), they nevertheless demonstrate that Levins' proposed class definition—predicated on the same records she dismisses for their "utter lack of clarity"—is unascertainable.

Nor has Levins met Rule 23(a)'s numerosity requirement. Levins attempts to meet this requirement with evidence that "almost three million individuals were called by Santander or on its behalf, on numbers not provided in the loan applications." Dkt. 103, at 17. From this, she reasons that "it is overwhelmingly likely that thousands of individuals—and certainly more than forty—fit the proposed Class and Subclass definitions." *Id.* But the volume of calls placed to numbers not listed in loan applications hardly quantifies class membership, which also asks whether the number was "otherwise volunteered" or "verified" before Santander called it, "as reflected in Santander's records," *id.* at 11—records which Plaintiffs concede cannot be used to make that determination. Nor has Levins attempted to identify any group of individuals (forty, or even less than that) who meet her class definition, further demonstrating that such a determination cannot be based on Santander's records alone.

Levins attempts to address this shortcoming by contending that "Santander has not challenged numerosity." *Id.* at 18. But the concession she cites was made in the case brought by Espejo (who does not seek class certification) with respect to a

18

different class definition which did not rely on Santander's records. *See* 8987 Dkt. 30, ¶ 19; 8987 Dkt. 117, at 11. Here by contrast, Levins relies upon Santander's records not only to define her class, but also to argue that it amounts to more than an improper "fail-safe" class, *i.e.*, "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). As Santander correctly argues, such a class definition "is improper because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *See id*; *see also* Dkt. 119, at 15 (citing *Messner*).

Levins argues that her proposed class is more than a mere "fail-safe" because it is "defined by objective criteria (as determined by reference to Santander's own internal records of the calls at issue)" and "is not pegged to ultimate success on the merits of the TCPA claims alleged here." Dkt. 139-1, at 3 n.1. But Plaintiffs' own challenges to Santander's records demonstrate that they provide no such "objective" criteria. Class membership would thus require a determination of consent—*i.e.*, whether the called party's number was "volunteered" or "verified" before Santander used it—as is liability under the TCPA, which likewise requires a call without "the prior express consent of the called party." *See* 47 U.S.C. § 227(b)(1)(A). Accordingly, Levins' proposed class fails not only because it is indefinite and she has failed to identify any group of members who fall within it, but also because disputes concerning Santander's records, such as Plaintiffs mount here, would also require a liability determination to determine class membership, rendering it an impermissible "fail-safe" class.

### B. Commonality and Predominance

Rule 23(a)(2) further requires "questions of law or fact common to the class," of which "even a single common question will do." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (brackets omitted). Levins proposes three. The first—whether "Santander's dialing equipment falls within the definition of an ATDS" (Dkt. 103, at 19)—has the potential for class treatment, assuming the same equipment and processes discussed above were used to call all class members. *But see* Dkt. 119, at 19 n.5 (asserting that "Santander has several processes for making calls") *and* Dkt. 108, at 4 n.2 (referring to other equipment used prior to 2009). But Levins' other two proposed questions are nonstarters, and none of Levins' three proposed questions would predominate in the litigation, as necessary to satisfy Rule 23(b)(3).

For instance, Levins' second proposed question—"whether Santander's standardized conduct resulted in an injury that entitles each Class Member to statutory damages under the TCPA" (Dkt. 103, at 21)—asks merely whether all class members "suffered a violation of the same provision of law." *Wal-Mart*, 564 U.S. at 350. Such "superficial" common questions "are not enough." *Jamie S. v. Milwaukee Public Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (citing *Wal-Mart*). That is because a "bottom-line liability" allegation of this sort fails to establish a common legal or factual question "that can be answered all at once" and thereby "resolve a central issue in all class members' claims." *Jamie S.*, 668 F.3d at 497.[3]

---

3 This is not to say that this "bottom-line liability question" poses jurisdictional concerns under the Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, 136 S.

Finally, Levins herself argues that her remaining proposed question—"whether Santander lacked consent to place the calls at issue" (Dkt. 103, at 20)—is not a question at all. As Levins puts it, "membership in the Class is closed to any person for whom Santander has evidence of prior express consent," since "the Class definition excludes all persons who provided their cellular telephone number to Santander on their financing documents, or by other means, as well as all persons who verified their telephone numbers prior to being called on them." Dkt. 103, at 20-21. The argument assumes, of course, that the issue of consent is resolved at the determination of class membership based on "Santander's records," which is precisely what renders the class unascertainable and an impermissible fail-safe, as explained above. But it also assumes that, having been so resolved, the issue no longer qualifies as a common question that unites the class. Thus, as Santander argues, either consent "is not relevant to the commonality showing," or "consent is at issue, in which case commonality fails for lack of common evidence." Dkt. 119, at 19.

---

Ct. 1540, 1548 (2016), as Santander suggests. *See* Dkt. 119, at 20. Both before and after *Spokeo*, courts "have consistently held that allegations of nuisance and invasion of privacy in TCPA actions are sufficient to state a concrete injury under Article III." *Hewlett v. Consol. World Travel, Inc.*, No. 2:16-713, 2016 WL 4466536, at *2 (E.D. Cal. Aug. 23, 2016) (collecting cases); *Aranda v. Caribbean Cruise Line, Inc.*, -- F. Supp. 3d --, 2016 WL 4439935, at *5-6 (N.D. Ill. Aug. 23, 2016) ("the receipt of unsolicited telemarketing calls that by their nature invade the privacy and disturb the solitude of their recipients" satisfies the "concrete injury" requirement of *Spokeo*). This Court concurs with those decisions. Nor does *Spokeo* require each class member to demonstrate this injury individually (thereby precluding class certification), since the same concrete injury of this statutory violation is sufficient under Article III for one and all. *See Aranda*, 2016 WL 4433995, at *6. But while Article III may be satisfied by alleging a TCPA injury, this Court holds that Rule 23 requires a more uniting "common question" than the bare allegation that each class member "suffered a violation of the same provision of law." *See Wal-Mart*, 564 U.S. at 350; *Jamie S.*, 668 F.3d at 497.

Even putting aside the ascertainability and fail-safe issues raised by Levins' proposed class definition, any unconsented calls suggested on the face of Santander's records that might be deemed sufficient for class membership would invariably lead to individualized factual disputes regarding whether consent was nevertheless previously obtained. As Santander argues, even if Levins' proposed class definition were accepted, "it cannot prevent Santander from asserting consent even in the face of records that do not 'reflect' consent." Dkt. 119, at 30. Once again, Plaintiffs' arguments in opposition to Santander's motions for summary judgment amply demonstrate that inevitability and how such questions would predominate (indeed, consume) the litigation. Although both Plaintiffs claim to have received calls to their respective numbers without their prior consent, Santander points to disparate documents and testimony to argue that each had consented beforehand. *See supra* Part I-A. The same sort of individualized "mini-trials" would be necessitated in a class action for countless class members. These are precisely the individualized consent issues that have led other courts to deny class certification of TCPA claims.[4]

As these cases explain, this result is compelled especially where (as here) the defendant produces evidence of a practice of obtaining prior consent from the parties it contacts. *See, e.g., Jamison*, 290 F.R.D. at 106-07 ("issues of individualized consent

---

4 *See, e.g., Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 106-07 (N.D. Ill. 2013) (denying certification where court would have "to conduct a series of mini-trials" regarding consent) (citing cases); *Gannon v. Network Tele. Servs., Inc.*, No. CV 12–9777, 2013 WL 2450199, at *2–3 (C.D. Cal. June 5, 2013) (denying certification where "some of the recipients may have consented"), *aff'd*, 628 Fed. App'x 551 (9th Cir. 2016); *G.M. Sign, Inc. v. Brink's Mfg. Co.*, No. 09 C 5528, 2011 WL 248511, at *8 (N.D. Ill. Jan. 25, 2011) (denying certification due to individualized consent issues).

predominate when a defendant sets forth specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cellphone" (citing cases)).   Santander has produced such evidence here.   *See* Dkt. 98-1, at Tab 1, ¶¶ 5-6 (attesting to Santander's policies regarding verification of contact information and recording do-not-call requests); Dkt. 119, at 6-7 (describing "written policies" requiring "using the dialer to call a person only when he or she had first given permission to be contacted at that number," and various means used to obtain, verify, and record consent).   Even Plaintiffs concede that Santander "has policies in place to verify contact information" (Dkt. 124, ¶ 15), and that such "verification" reflected in the activity notes of Santander's call logs "indicates that a consumer has confirmed that his or her contact information is correct."   *See* Dkt. 125, ¶ 5.

Indeed, Levins' proposed class definition depends upon established policies for obtaining and recording consent, as it assumes that Santander's "very detailed" call records "determine the individuals who were called without consent."   *See* Dkt. 103, at 8 ("Santander's records identify whether verifications of contact information were made on a call"), 11 (class definition), 29 ("one need only look to Santander's records—which are very detailed—to determine the individuals who were called without consent.").   But contrary to Levins' suggestion, these "very detailed" records amplified the factual disputes regarding Plaintiffs' consents in the instant case (*see supra* Part I, A), and would inevitably produce similar factual disputes for a multitude of class members.   Because these individualized issues (rather than any common issue) would predominate, class certification under Rule 23(b)(3) must be denied.

23

## C. Typicality and Adequacy of Representation

Similar issues thwart Levin's showings of typicality and adequacy of representation under Rule 23(a). Typicality requires "enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to ligate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). "Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Oshana*, 472 F.3d at 514 (internal quotation marks omitted). Thus, where a representative's claim "involves facts that distinguish her claim from the claims of her fellow class members," typicality is lacking. *Muro v. Target Corp.*, 580 F.3d 485, 492 (7th Cir. 2009).

"The same concerns arise again when we consider adequacy of representation," *Spano*, 633 F.3d at 586, since "the usual practical significance of lack of typicality, as again explained in *CE Design*, is that it undermines the adequacy of the named plaintiff as a representative of the entire class." *Randall v. Rolls Royce Corp.*, 637 F.3d 818, 824 (7th Cir. 2011). "The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *C.E. Design*, 637 F.3d at 726 (internal quotation marks omitted). "The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to [her] so that the representation of the rest of the class will suffer." *Id*. This is the problem Levins faces.

As a class representative, Levins insists that Santander's call records are "very detailed" and capable of resolving the issue of consent in favor of all class members. Dkt. 103, at 8, 29. Levins candidly admits that the purpose of this assertion is to eliminate any "individual issues regarding consent," since (she says) all such disputes would be obviated by her class definition. *Id*. at 28-30. As discussed above, the argument fails because Santander and a multitude of class members would nevertheless raise individualized consent disputes. But even assuming a class whose members rely on Santander's call records to demonstrate their lack of consent, Levins is plainly at odds with it. That is because, to save her own claim from summary judgment, Levins argues, against the interests of such class members, that Santander's call records "contain many inconsistencies" that prevent the Court from determining whether she consented to the use of her 6074 number (the basis for her class claim) before Santander called it, because "there's no way from looking at the notes" to determine whether Levins had consented on the earlier date that Santander contends. Dkt. 124, ¶¶ 43-44.

Levins "cannot be an adequate representative" of a class of "unconsenting" call recipients if she "is subject to a defense that couldn't be sustained against other class members" on the very issue of consent. *C.E. Design*, 637 F.3d at 725. Worse still, to the extent "the Classes consist of only those individuals who (as reflected in and established in Santander's call records never provided any indicia of consent to be called" (Dkt. 103 at 29), Levins is not even a member of it. That, too, disqualifies her as a class representative. *See Bell*, 800 F.3d at 373 ("the class representative must be part of the class and possess the same interest and suffer the same injury").

25

### D.    Superiority

In addition to requiring that questions common to all class members predominate over those "affecting only individual members," Rule 23(b)(3) further requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Such "superiority" must be assessed in terms of class members' interests in proceeding individually, the extent and nature of existing litigation, the desireability of litigating the claims in the instant forum, and manageability concerns, *id.*, which in turn requires a court to consider "the costs and benefits of the class device." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663-64 (7th Cir. 2015). Regarding this last factor, the Court is mindful that "refusing to certify on manageability grounds alone should be the last resort." *Id.* But the significant manageability concerns raised here, especially in light of Levin's failure to make a case for certification under Rule 23(a), similarly militate against certification.

As discussed extensively above, Levins' proposed class definition is derailed by its lack of definitive criteria regarding the consent (or non-consent) of putative class members to be called by Santander. But there are other administrative difficulties posed by this definition wholly apart from its indefiniteness, including the need to review several million call records to determine (1) the equipment and calling method used, (2) whether the number called was a cell phone number, (3) whether the individual called was the subscriber to that cell phone account; (4) whether that cell phone number was provided to Santander in a disqualifying credit document; (5) whether the individual's loan was subject to an arbitration agreement; (6) whether the

26

individual already filed a TCPA action; and (7) whether the individual's TCPA claim has been arbitrated, adjudicated, waived, or otherwise released. *See* Dkt. 103, at 11; Dkt. 119, at 22-25. Santander convincingly argues that identifying such individuals from the millions of call records for the class period (December 2007-present) would be exceedingly time-consuming and difficult, if at all possible. Dkt. 119, at 22-25.

Levins contends that "each of Santander's manageability challenges can be disregarded" (Dkt. 139-1, at 22), but her logic is faulty. For instance, Levins argues that there is no need to determine which calls were made using the Aspect dialer's manual mode (*id*. at 19), but fails to address the need to eliminate Santander's use of other equipment altogether. *See* Dkt. 108, at 4 n.2 (acknowledging use of other equipment prior to 2009); Dkt. 139-1, at 21 (acknowledging need to "eliminate the accounts for individuals who were not called by the Aspect dialer"). Similarly, Levins argues that "stated concern[] about reviewing financing documents . . . does not even apply to the Subclass" (*id*. at 20), but the Subclass incorporates all of the limitations of the TCPA Class, which Levins has not abandoned in any event. *See* Dkt. 103, at 11. And even Levins concedes the difficulty that would be encountered in obtaining and reviewing the cell phone records necessary to identify which called numbers were cell phone numbers and which called individuals were the subscribers to the cell phone accounts associated with those numbers, assuming those records can be acquired in the first place. *See* Dkt. 139-1, at 20-21 and n.12 (conceding that Santander's "records are insufficient to identify which telephone numbers were cellular at the time they were called," but contending that "wireless carriers maintain historical subscriber data").

Levins also concedes another factor for determining superiority—the incentive of individual class members to bring solo actions. *See Mullins*, 795 F.3d at 658. Even Levins admits that "courts throughout the country have recognized" that "the TCPA has built-in incentives for aggrieved plaintiffs to litigate individually—such as the opportunity to collect statutory damages." Dkt. 103, at 31 (brackets omitted). This principle is demonstrated also by individual TCPA actions brought against Santander itself. *See* Dkt. 119, at 26. Combined with the substantial difficulties involved in identifying putative class members, the admitted and demonstrated incentive of individuals to sue on their own behalf compels the conclusion that class treatment—to address merely whether the Aspect dialer is an ATDS—is neither necessary nor superior to individual actions which have done, and can do, the same.

## CONCLUSION

For the foregoing reasons, Defendant Santander Consumer USA, Inc.'s Motion for Summary Judgment in Case No. 11-cv-8987 (Dkt. 167 in that case) is denied; Santander's Motion for Summary Judgment in Case No. 12-cv-9431 (Dkt. 94 in that case) is granted in part as explained above, and otherwise denied; and Plaintiff Faye Levins' Motion for Class Certification in Case No. 12-cv-9431 (Dkt. 100 in that case) is denied. This matter is set for status on November 1, 2016, at 9:30 a.m.

Dated: October 14, 2016

_____
Charles P. Kocoras
United States District Judge

28