UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HENRY ESPEJO, individually and on behalf of all others similarly situated, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 11 C 8987<br>)<br>) Judge Charles P. Kocoras |
| SANTANDER CONSUMER USA, INC., an Illinois corporation, | )<br>)<br>) |
| Defendant. | )<br>) |
| FAYE LEVINS, individually and on behalf of all others similarly situated, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) No. 12 C 9431<br>)<br>) Judge Charles P. Kocoras |
| SANTANDER CONSUMER USA, INC., an Illinois corporation, | )<br>)<br>) |
| Defendant. | )<br>) |

**MEMORANDUM OPINION**

**CHARLES P. KOCORAS, District Judge:**

Now before the Court is Defendant Santander Consumer USA, Inc.'s ("Santander") renewed motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.1 and motion for reconsideration. For the following reasons, the Court denies the Defendants' motions.

## BACKGROUND

The underlying facts in this case are detailed in our prior opinion,[1] and the Court provides only a brief restatement based on undisputed facts from the record.

Plaintiffs Henry Espejo ("Espejo") and Faye Levins ("Levins") (collectively, "Plaintiffs") each brought class action suits against Defendant Santander for violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, actions which have since been consolidated. These claims arose when Santander utilized its Aspect Telephone System ("Aspect") to make calls to the Plaintiffs regarding outstanding auto loans. Santander utilizes Aspect in combination with a customer account management system called "My Supervisor." The company uses "My Supervisor" to generate a customer list and then uploads the list into Aspect.

Aspect has a dialer feature that dials phone numbers from a customer list using an algorithm to efficiently match available customer service agents to answered calls. The dialer only makes calls once a customer service agent logs-in and presses a button to indicate that they are available.

On April 21, 2016, Santander filed a motion for summary judgment, partially on the grounds that Aspect's dialer feature did not constitute an automatic telephone dialing system ("ATDS"), which is an essential element of the Plaintiffs' TCPA claim. That same day, Santander moved the Court to stay the proceedings until the D.C. Circuit issued its ruling in *ACA International v. Federal Communications Commission*, 885

---

[1] 1:11-cv-8987, Dkt. 215.

F.3d 687 (D.C. Cir. 2018), a consolidated action that considered the validity of the Federal Communications Commission ("FCC") rulemaking regarding the TCPA. On October 14, 2016, the Court denied Santander's motions, but stated that it would "revisit any issues affected by [the *ACA International*] decision as needed, at any time before the trial in this case."

On March 16, 2018, the D.C. Circuit issued its ruling in *ACA International*. Based on the decision, Santander renewed its motion for summary judgment on and moved the Court to reconsider its initial denial.

## **LEGAL STANDARD**

In considering a motion for summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact arises where a reasonable jury could find, based on the evidence of record, in favor of the non-movant. *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court considers the "record as a whole." *Morgan v. Harris Trust & Sav. Bank of Chi.*, 867 F.2d 1023, 1026 (7th Cir. 1989).

When a court denies a motion for summary judgment, "the denial…has no res judicata effect, and the district court may, in its discretion, allow a party to renew a previously denied summary judgment motion…." *Whitford v. Boglino*, 63 F.3d 527,

531 (7th Cir. 1995). "A renewed or successive summary judgment motion is appropriate especially if one of the following grounds exists: (1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3) need to correct a clear error or prevent manifest injustice." *Id.* (internal quotation marks omitted).

A motion for reconsideration is appropriate where "the Court has patently misunderstood a party, or … [there has been] a controlling or significant change in the law or facts since the submission of the issue to the Court." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.3d 1185, 1191 (7th Cir. 1990).

## **DISCUSSION**

To contextualize the contested issues in this case, the Court must walk through the relevant statutory, administrative, and judicial history of the TCPA. As pertinent here, the TCPA prohibits using an ATDS to call a telephone number assigned to a cellular telephone service. 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA defines an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Given the FCC's "authority to promulgate regulations implementing the TCPA," the FCC issued an order in 1992 that "adopted, without elaboration, the statutory definition of [an] ATDS." *Pinkus v. Sirius XM Radio, Inc.*, 319 F.Supp.3d 927, 929 (N.D. Ill. 2018).

In 2003, the FCC expressed concern that "[t]he marketplace for telemarketing has changed significantly in the last decade." In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14021 (2003). Specifically, the FCC noted the advent of the predictive dialer, which is "an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that 'predicts' the time when a consumer will answer the phone and a telemarketer will be available to take the call." Id. at 14022 n.31.

Since the widespread adoption of predictive dialer technology, it has been disputed whether such systems fit within the definition of an ATDS. The FCC summarized the debate, saying:

> Most industry members that commented on the issue of autodialed calls argue that predictive dialers do not fall within the statutory definition of "automatic telephone dialing system," primarily because, they contend, predictive dialers do not dial numbers "randomly or sequentially." Rather, they state that predictive dialers store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers. Most consumers and consumer groups maintain that predictive dialers are autodialers; that to distinguish technologies on the basis of whether they dial randomly or use a database of numbers would create a distinction without a difference. They argue that for the recipient of the call, there is no difference whether the number is dialed at random or from a database of numbers.

Id. at 14090–91. Essentially, the disagreement turns on whether an ATDS needs to dial numbers produced "randomly or sequentially" or whether those numbers can be automatically dialed from a pre-existing list.

5

To clarify which of the competing views was correct, the FCC promulgated additional rules regarding the definition of an ATDS in 2003 ("2003 Order"). The FCC determined that a predictive dialer did fall within the definitional scope of an ATDS, stating:

> We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of "automatic telephone dialing equipment" and the intent of Congress.

*Id.* at 14092–93. In adopting the consumer groups' position, the FCC established that a dialing system is still considered an ATDS even if it dials phone numbers from a pre-existing list. The FCC affirmed this position in its 2008 rules and regulations ("2008 Order"). In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 23 F.C.C. Rcd. 559, 566 (2008).

Less than a decade later, the FCC issued additional rules and regulations "to reiterate and simplify the relevant portions of the TCPA" ("2015 Order"). In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C. Rcd. 7961, 7971 (2015). First, the FCC sought to clarify the meaning of the term "capacity" in the ATDS definition. It stated, "the TCPA's use of 'capacity' does not exempt equipment that lacks the 'present ability' to dial randomly and sequentially." *Id.* at 7974. Rather, "the capacity of an autodialer is not limited to its current configuration but also includes its potential functionalities." *Id.* In other words, a

device that could be modified into an autodialer falls within the TCPA's prohibitions. Second, the FCC reiterated that a predictive dialer is considered an ATDS. *Id.* at 7972. It noted that one function of an ATDS is the ability to dial numbers without human intervention. *Id.* at 7975. However, the FCC declined the opportunity to clarify that if a device lacked the ability to dial numbers without human intervention, it would not be deemed an ATDS. *Id.* at 7976. The FCC also stated that a second function of an ATDS is the ability to "dial random or sequential numbers" or numbers from a customer list. *Id.* at 7971–72.

Instead of providing the desired clarity regarding the ATDS definition, the FCC's 2015 Order sparked confusion amongst those seeking to use predictive dialers. As a result, "a large number of regulated entities challenged the FCC's definition of an ATDS in the D.C. and Seventh Circuits, and the petitions were consolidated in the D.C. Circuit" in the case *ACA International. Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1046 (9th Cir. 2018). First, the D.C. Circuit rejected the FCC's "expansive interpretation of 'capacity'" because it could be construed to encompass smartphones. *ACA Int'l*, 885 F.3d at 696. The Court emphasized that "[i]t is untenable to construe the term 'capacity'…in a manner that brings within the definition's fold the most ubiquitous type of phone equipment known, used countless times each day for routine communications by the vast majority of people in the country." *Id.* at 698. Accordingly, the D.C. Circuit held that the FCC's interpretation "cannot be sustained, at least given the Commission's unchallenged assumption that a call made with a device

7

having the capacity to function as an autodialer can violate the statute even if the autodialer features are not used to make the call." *Id.* at 695.

Second, the D.C. Circuit overturned the FCC's interpretation of a predictive dialer as an ATDS because the espoused functional requirements were inconsistent. *Id.* at 702–03. The Court expressed its puzzlement over the FCC's contradictory guidance, stating:

> So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity? The 2015 ruling, while speaking to the question in several ways, gives no clear answer (and in fact seems to give both answers). It might be permissible for the Commission to adopt either interpretation. But the Commission cannot, consistent with reasoned decisionmaking, espouse both competing interpretations in the same order.

*Id.* The Court articulated a similar dismay over the FCC's human intervention standards. The Court noted, "[a]ccording to the Commission, then, the 'basic function' of an autodialer is to dial numbers without human intervention, but a device might still qualify as an autodialer even if it cannot dial numbers without human intervention. Those side-by-side propositions are difficult to square." *Id.* at 703. Due to these inconsistencies, the D.C. Circuit held that the FCC's guidance on the meaning of an ATDS failed "the requirement of reasoned decisionmaking." *Id.* at 700 (internal quotation marks omitted).

\* \* \*

In the wake of *ACA International*, Santander renewed its motion for summary judgment, arguing that the legal principles the Court relied on in its initial denial "have been entirely upended." While the parties have no material factual disputes, they diverge on the legal implications of the *ACA International* decision. Specifically, the parties take conflicting stances regarding: (1) whether *ACA International* confined its decision to the FCC's 2015 Order, or whether the decision also overruled the FCC's 2003 and 2008 Orders; and (2) If *ACA International* did overrule the prior FCC Orders, whether the Court should interpret the definition of an ATDS to include predictive dialers. The Court addresses each argument in turn.

**I. Impact of *ACA International* on the FCC's 2003, 2008, and 2015 Orders**

In *ACA International*, the D.C. Circuit invalidated portions of the FCC's 2015 Order that concerned the definition of an ATDS. *Id.* at 700. However, both the parties and courts across the country are split as to whether *ACA International* also invalidated the FCC's 2003 and 2008 Orders.

The Plaintiffs maintain that *ACA International* is confined to the FCC's 2015 Order due to the jurisdictional limitations imposed by the Hobbs Act, 28 U.S.C. § 2342(1). This statute grants the court of appeals exclusive jurisdiction to determine the validity of all final orders by the FCC. *Id.* However, the court can only review FCC orders challenged within sixty days of its entry. 28 U.S.C. § 2344. Therefore, the Plaintiffs and slightly less than half of the district courts to consider this question believe that *ACA International* only impacted the expanded ATDS interpretations found

9

in the FCC's 2015 Order, leaving the 2003 and 2008 Orders intact because they were outside the period of reviewability.[2] With the FCC's 2003 and 2008 Orders undisturbed, the Plaintiffs contend, "it remains the law that *all* predictive dialers qualify as ATDSs." *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 931–32 (N.D. Ill. 2018).

Santander, on the other hand, argues that the D.C. Circuit considered this argument and squarely rejected it. In *ACA International*, the Court wrote:

> [T]he Commission maintains that the court lacks jurisdiction to entertain petitioners' challenge concerning the functions a device must be able to perform. The agency reasons that the issue was resolved in prior agency orders—specifically, declaratory rulings in 2003 and 2008 concluding that the statutory definition of an ATDS includes "predictive dialers," dialing equipment that can make use of algorithms to "assist[ ] telemarketers in predicting when a sales agent will be available to take calls." According to the Commission, because there was no timely appeal from those previous orders, it is too late now to raise a challenge by seeking review of a more recent declaratory ruling that essentially ratifies the previous ones. We disagree. While the Commission's latest ruling purports to reaffirm the prior orders, that does not shield the agency's pertinent

---

[2] *Duran v. La Boom Disco, Inc.*, 369 F. Supp. 3d 476, 488 (E.D.N.Y. 2019) (finding that *ACA International*'s invalidation of the FCC's 2015 Order did not invalidate the analogous portions of the FCC's 2003 and 2008 Orders); *Reyes v. BCA Fin. Servs., Inc.*, 312 F. Supp. 3d 1308, 1320 (S.D. Fla. 2018) (same); *Ramos v. Hopele of Fort Lauderdale, LLC*, 334 F. Supp. 3d 1262, 1272 (S.D. Fla. 2018) (same); *Maes v. Charter Commc'n*, 345 F. Supp. 3d 1064, 1065 (W.D. Wis. 2018) (same); *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578, 587 (M.D. Tenn. 2018) (same); *Jiminez v. Credit One Bank, N.A.*, No. 17 CV 2844, 2019 WL 1409425, at *5 (S.D.N.Y. Mar. 28, 2019) (same); *Wilson v. Quest Diagnostics Inc.*, No. CV 2:18-11960, 2018 WL 6600096, at *3 (D.N.J. Dec. 17, 2018) (same); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-CV-06314, 2018 WL 3707283, at *6 (N.D. Cal. Aug. 3, 2018) (same); *Somogyi v. Freedom Mortg. Corp.*, No. CV 17-6546, 2018 WL 3656158, at *4 (D.N.J. Aug. 2, 2018) (same); *Sieleman v. Freedom Mortg. Corp.*, No. CV 17-13110, 2018 WL 3656159, at *3 (D.N.J. Aug. 2, 2018) (same); *Pieterson v. Wells Fargo Bank, N.A.*, No. 17-CV-02306, 2018 WL 3241069, at *3 (N.D. Cal. July 2, 2018) (same); *O'Shea v. Am. Solar Sol., Inc.*, No. 3:14-CV-00894, 2018 WL 3217735, at *2 (S.D. Cal. July 2, 2018) (same); *McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396, 2018 WL 3023449, at *3 (N.D. Cal. June 18, 2018) (same); *Castrellon v. Fitness Club Mgmt.., LLC*, No. CV 17-08825, 2018 WL 5099741, at *5 (C.D. Cal. June 6, 2018) (same); *Maddox v. CBE Grp., Inc.*, No. 1:17-CV-1909, 2018 WL 2327037, at *4 (N.D. Ga. May 22, 2018) (same); *Swaney v. Regions Bank*, No. 2:13-CV-00544, 2018 WL 2316452, at *1 (N.D. Ala. May 22, 2018) (same).

pronouncements from review.

*ACA Int'l*, 885 F.3d at 701 (internal citations omitted). Two circuit courts have directly addressed this question and aligned with Santander's position. The Second Circuit held that *ACA International* "invalidated [the FCC's orders] and thereby removed any deference we might owe to the views of the FCC expressed in it." *King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018). The Ninth Circuit agreed, finding that "[t]he D.C. Circuit concluded that the parties' 2015 rulemaking petition to the FCC reopened consideration of the definition of ATDS established in the FCC's 2003 order, as well as its subsequent rulings." *Marks*, 904 F.3d at 1047. Moreover, a marginal majority of the district courts to opine on this issue have adopted the position that *ACA International* invalidated the interpretation of an ATDS found in the FCC's 2003, 2008, and 2015 Orders.[3] The Court agrees with this position.

---

[3] *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 932 (N.D. Ill. 2018) ("*ACA International* invalidated not only the 2015 Declaratory Ruling's interpretation of the statutory term ATDS, but also the 2008 Declaratory Ruling's and 2003 Order's interpretation of that term."); *Johnson v. Yahoo!, Inc.*, 346 F. Supp. 3d 1159, 1161 (N.D. Ill. 2018) (same); *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 621 (N.D. Iowa 2019) (same); *Sessions v. Barclays Bank Delaware*, 317 F. Supp. 3d 1208, 1212 (N.D. Ga. 2018) (same); *Herrick v. GoDaddy.com LLC*, 312 F. Supp. 3d 792, 799 (D. Ariz. 2018) (same); *Gary v. TrueBlue, Inc.*, 346 F. Supp. 3d 1040, 1043 (E.D. Mich. 2018) (same); *Keyes v. Ocwen Loan Servicing, LLC*, 335 F. Supp. 3d 951, 960 (E.D. Mich. 2018) (same); *Fleming v. Associated Credit Servs., Inc.*, 342 F. Supp. 3d 563, 574 (D.N.J. 2018) (same); *Richardson v. Verde Energy USA, Inc.*, 354 F. Supp. 3d 639, 648 (E.D. Pa. 2018) (same); *Adams v. Ocwen Loan Servicing, LLC*, 366 F. Supp. 3d 1350, 1354 (S.D. Fla. 2018) (same); *Yates v. Checkers Drive-In Restaurants, Inc.*, No. 17-CV-9219, 2019 WL 1437906, at *2 (N.D. Ill. Apr. 1, 2019) (same); *Gadelhak v. AT&T Servs., Inc.*, No. 17-CV-01559, 2019 WL 1429346, at *4 (N.D. Ill. Mar. 29, 2019) (same); *Folkerts v. Seterus, Inc.*, No. 17 C 4171, 2019 WL 1227790, at *6 (N.D. Ill. Mar. 15, 2019) (same); *Melvin v. Ocwen Loan Servicing LLC*, No. 8:18-CV-1911-T-36SPF, 2019 WL 1980605, at *3 (M.D. Fla. May 3, 2019) (same); *Larson v. Harman Mgmt. Corp.*, No. 16-CV-00219, 2018 WL 6459964, at *2 (E.D. Cal. Dec. 10, 2018) (same); *Roark v. Credit One Bank, N.A.*, No. CV 16-173, 2018 WL 5921652, at *3 (D. Minn. Nov. 13, 2018) (same); *Evans v. Pennsylvania Higher Educ. Assistance Agency*, No. 3:16-CV-82, 2018 WL 6362637, at *2 (N.D. Ga. Oct. 11, 2018) (same); *Gonzalez v. Ocwen Loan Servicing, LLC*, No. 5:18-CV-340, 2018 WL 4217065, at *6 (M.D. Fla. Sept. 5, 2018) (same); *Washington v. Six Continents Hotels, Inc.*, No. 216CV03719, 2018 WL 4092024, at *3 (C.D. Cal.

Given this stance, the Court is not bound by the FCC's views on the definition of an ATDS. As such, "only the statutory definition of ATDS as set forth by Congress in 1991 remains." *Marks*, 904 F.3d at 1050.

## II. The ATDS Definition and Predictive Dialers

Absent FCC guidance, the Court must look to the statutory definition of an ATDS to consider the remaining issues in this case. Relying on this definition, the parties disagree as to the functionality required for a type of equipment to constitute an ATDS. Specifically, the parties take differing views regarding the generation of telephone numbers and the acceptable amount of human intervention.

### A. Telephone Number Generation Requirement

#### *i. Plain Meaning*

First, the parties dispute whether a type of equipment can be considered an ATDS if it does not have the ability to generate random or sequential telephone numbers, but rather automatically dials numbers from a pre-existing list. To determine the proper interpretation of an ATDS, the Court first looks to the language of the statute. *United States v. Miscellaneous Firearms, Explosives, Destructive Devices & Ammunition*, 376 F.3d 709, 712 (7th Cir. 2004). If the language is unambiguous, the Court applies the plain meaning of the statute. *Id.* However, if the language is ambiguous, the Court may look to other tools of statutory interpretation. *Id.*

---

Aug. 24, 2018) (same); *Gary v. TrueBlue, Inc.*, No. 17-CV-10544, 2018 WL 3647046, at *6 (E.D. Mich. Aug. 1, 2018) (same).

The TCPA defines an ATDS as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). There are two prevailing interpretations of this language.

The Plaintiffs side with the school of thought adopted by the Ninth Circuit,[4] which asserts that the ATDS definition covers predictive dialers because it anticipates the use of pre-existing customer lists. This position asserts that the statutory phrase "using a random or sequential number generator" modifies the term "produce" not the term "store." *Marks*, 904 F.3d at 1050. The underlying rationale is that "a number generator is not a storage device; a device could not use 'a random or sequential number generator' to store telephone numbers." *Id.* Therefore, it does not make sense to apply the adverbial "using" phrase to the term "store." Further, because the statute uses the disjunctive "or," the equipment does not need to "produce" telephone numbers to be called if it can "store" telephone numbers to be called. Accordingly, "the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically." *Id.* at 1052. Therefore, the Ninth Circuit determined that "the term automatic telephone dialing system means equipment which has the capacity— (1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers."

---

[4] *Marks*, 904 F.3d at 1052.

*Id.*

Santander subscribes to the competing school of thought, adopted by the Third Circuit,[5] which asserts that the ATDS definition necessarily excludes predictive dialers because they do not have the capacity to generate numbers randomly or sequentially. This position notes that "store" and "produce" are both transitive verbs that require an object, which in this case is the phrase "telephone numbers to be called." *Pinkus*, 319 F. Supp. 3d at 937. "Despite the disjunctive 'or' linking 'store' and 'produce,' 'store' is not a grammatical orphan, rather, like 'produce,' it is tied to the object, 'telephone numbers to be called.'" *Id.* at 937–38. Moreover, this interpretation emphasizes that the adverbial "using" phrase follows both verbs, so it cannot grammatically modify only "produce." *Id.* at 937. Rather, "[g]iven its placement immediately after 'telephone numbers to be called,' the phrase 'using a random or sequential number generator' is best read to modify 'telephone numbers to be called,' describing the quality of the numbers an ATDS must have the capacity to store or produce." *Id.* at 938. Therefore, "the phrase 'using a random or sequential number generator' necessarily conveys that an ATDS must have the capacity to generate telephone numbers, either randomly or sequentially, and then to dial those numbers." *Id.*

---

[5] *See Dominguez on Behalf of Himself v. Yahoo, Inc.*, 894 F.3d 116, 121 (3d Cir. 2018) ("Ultimately, [Appellant] cannot point to any evidence that creates a genuine dispute of fact as to whether the Email SMS Service had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers.").

Based solely on the statutory text, either of these interpretations are reasonable. Therefore, the Court joins the Ninth and D.C. Circuits in finding the ATDS definition to be facially ambiguous. *Marks*, 904 F.3d at 1051 ("After struggling with the statutory language ourselves, we conclude that it is not susceptible to a straightforward interpretation based on the plain language alone. Rather, the statutory text is ambiguous on its face."); *ACA Int'l*, 885 F.3d at 702–03 ("So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity? …It might be permissible for the Commission to adopt either interpretation.").

### ii. Statutory Structure and Context

As the Seventh Circuit instructs, "because we see ambiguity, we look at the entire text and structure of the statute to determine its meaning. Interpretations inconsistent with that structure and context should be rejected." *Miscellaneous Firearms*, 376 F.3d at 712. Based on this analysis the Ninth Circuit noted, "[t]he structure and context of the TCPA as originally enacted indicate that Congress intended to regulate devices that make automatic calls." *Marks*, 904 F.3d at 1051.

The Court based its conclusion on the provisions of the TCPA that allow an ATDS to call designated categories of numbers. *Id.* For example, the TCPA permits the use of an ATDS to "make any call… with the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii). "To take advantage of this permitted use, an autodialer would have to dial from a list of phone numbers of persons who had

15

consented to such calls, rather than merely dialing a block of random or sequential numbers." *Marks*, 904 F.3d at 1051. Similarly, the TCPA exempts the use of an ATDS to make calls "solely to collect a debt owed to or guaranteed by the United States." 47 U.S.C. § 227(b)(1)(A)(iii). As the Ninth Circuit reasoned:

> Like the exception allowing the use of an autodialer to make calls "with the prior express consent of the called party," the debt collection exception demonstrates that equipment that dials from a list of individuals who owe a debt to the United States is still an ATDS but is exempted from the TCPA's strictures.

*Marks*, 904 F.3d at 1052. These exemptions illustrate that Congress intentionally defined an ATDS to have the capability to make calls from a pre-existing list, rather than exclusively calling numbers generated randomly or sequentially.

To further demonstrate this point, the TPCA includes a treble damages clause in the event that a defendant committed a willful and knowing violation of the statute. 47 U.S.C. § 227(b)(3). It is difficult to square how a defendant could commit a willful and knowing violation of the TCPA if the employed ATDS is dialing numbers randomly or sequentially. Instead, it logically follows that a willful or knowing violation would involve placing calls to pre-determined phone numbers which the defendant knew were restricted under the TCPA. These structural and contextual features of the TCPA lead the Court to believe that the "language in the statute indicates that equipment that made automatic calls from lists of recipients was also covered by the TCPA." *Marks*, 904 F.3d at 1051.

### *iii. Legislative Intent*

Next, the Court turns to the legislative history to decipher which definitional interpretation of an ATDS Congress intended. The enactment of the TCPA was motivated by the exponential increase in automated telemarketing calls. H.R. Rep. 102-317, at 2 (1991). As Senator Fritz Hollings protested, "[c]omputerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; the force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." 137 Cong. Rec. S16,205 (daily ed. Nov. 7, 1991) (statement of Sen. Hollings). Senator Hollings was not alone in that feeling, as "[m]any consumers [were] outraged [by] the proliferation of intrusive, nuisance calls to their homes from telemarketers." H.R. Rep. 102-317, at 2.

In response to these concerns, Senator Hollings proposed "a bill to amend the Communications Act of 1934, in order to 'protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile (fax) machines and automatic dialers.'" S. Rep. No. 103-178, at 2 (1991). This bill was enacted and is now the statute known as the TPCA.

While the call targets have expanded from residential lines to cellular telephone lines, the pervasiveness of automated telemarketing calls has remained constant. Likewise, consumers continue to face a barrage of privacy invasions from automated telemarketing calls. As the FCC previously noted, "for the recipient of the call, there

is no difference whether the number is dialed at random or from a database of numbers." In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 18 F.C.C. Rcd. 14014, 14091 (2003).

Given Congress's particular contempt for automated calls and concern for the protection of consumer privacy, the legislative history of the TCPA supports the Ninth Circuit's position that the ATDS definition includes autodialed calls from a pre-existing list of recipients. To hold otherwise would exempt a "widely used" automated dialing technology from the purview of the TCPA, leaving consumers without recourse for the precise problems Congress already addressed. *Id.* at 14090.

Because the Court adopts the interpretation of the ATDS definition that permits dialing pre-existing customer lists, Santander's Aspect system is not exempt from the TCPA as a matter of law. Indeed, because Aspect automatically dials numbers from a set customer list, it falls within the definition of an ATDS.

### B. Human Intervention Requirement

Next, the parties dispute the acceptable amount of human intervention for equipment to be deemed an ATDS. Santander suggests that a predictive dialer requiring any amount of human intervention cannot constitute an ATDS. The Plaintiffs take an opposing view, asserting that minimal human intervention is inevitable and does not place a particular equipment beyond the TCPA's reach. The Plaintiffs further suggest that *ACA International* should not alter the Court's previous decision regarding human intervention because courts continue to assess the acceptable level on a case-by-case

18

basis. The Court agrees with the Plaintiffs and reaffirms its previous decision with respect to human intervention.

To reiterate, "[e]very ATDS requires some initial act of human agency—be it turning on the machine or pressing 'Go.' It does not follow, however, that every subsequent call the machine dials—or message it sends—is a product of that human intervention." *Johnson v. Yahoo!, Inc.*, No. 14 CV 2028, 2014 WL 7005102, at *5 (N.D. Ill. Dec. 11, 2014); *See also Marks*, 904 F.3d at 1052–53 ("Common sense indicates that human intervention of some sort is required before an autodialer can begin making calls, whether turning on the machine or initiating its functions. Congress was clearly aware that, at the very least, a human has to flip the switch on an ATDS."). Therefore, as a matter of functional practicality, some degree of human intervention is inevitable in any ATDS.

Moreover, the statutory language reveals what Congress anticipated would be automatic—the dialing. "By referring to the relevant device as an '*automatic* telephone *dialing* system,' Congress made clear that it was targeting equipment that could engage in automatic *dialing*, rather than equipment that operated without any human oversight or control." *Marks*, 904 F.3d at 1052 (citing *ACA Int'l*, 885 F.3d at 703 ("'[A]uto' in autodialer—or, equivalently, 'automatic' in 'automatic telephone dialing system'— would seem to envision non-manual dialing of telephone numbers.") (internal citations omitted)). Because predictive dialers engage in the automatic dialing of telephone numbers, the initial functionality of the machine need not be completely free of all

19

human intervention.

Santander's Aspect system requires human intervention to the extent of uploading a pre-existing customer list and clicking a button to indicate a customer service agent's availability. From there, Aspect's dialer responds to the customer service agent's availability and begins dialing numbers from the list based on a programmed algorithm. "Thus, according to Santander's own description, its Aspect dialer—not the agents—makes the calls by dialing numbers from the uploaded list." 1:11-cv-8987, Dkt. 215. This falls within the acceptable and inevitable amount of human intervention for an ATDS.

## CONCLUSION

For the aforementioned reasons, the Court denies the Defendant's motions. It is so ordered.

Dated: 06/12/2019

_____
Charles P. Kocoras
United States District Judge